**Mohammad Ali SABA, Appellee**

v.

**COMPAGNIE NATIONALE AIR FRANCE, Appellant.**

No. 94–7211.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 30, 1995.

Decided March 15, 1996.

---

**4.** Interior originally sought to add this report to the record on appeal but no longer attempts to do so.

James B. McQuillan, New York City, argued the cause and filed the briefs for appellant. Barbara D. Burke, Washington, DC, entered an appearance.

Mark A. Clodfelter, argued the cause and filed the brief for appellee. Michael L. Spekter, Washington, DC, entered an appearance.

Before: WALD, SILBERMAN, and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Circuit Judge WALD.

SILBERMAN, Circuit Judge:

Air France appeals the district court's determination that it engaged in "willful misconduct" and was accordingly not entitled to limit its liability, under Article 22 of the Warsaw Convention, for damage to carpets owned by Mohammad Ali Saba and transported by Air France. We disagree with the district court's formulation of the standard for willful misconduct, and believe that the evidence presented does not, as a matter of

law under the appropriate standard, amount to willful misconduct. We reverse.

## I.

Appellee Saba arranged in 1990 to have Air France ship 575 carpets from Salzburg, Austria to Dulles Airport in Virginia. Air France accepted the carpets in 191 bales—each containing a bundle of two to five rolled carpets separated with plastic and wrapped in burlap—from Saba's freight forwarder on September 19, 1990. The carpets were shipped by truck from Salzburg to Linz, Austria. At Air France's station in Linz, Air France employees loaded the bales in roughly even amounts onto metal pallets and into cargo containers. The carpets were then flown to Kennedy International Airport in New York City, and subsequently transported by truck to the cargo facility of Dynair, Air France's cargo agent, at Dulles Airport.

Dynair stored the carpets outside, in accordance with its usual practice when its warehouse was full, and they remained outside for five days. Dynair employees placed additional, heavy-gauge plastic over the cargo on the pallets and added similar plastic to the top of the cargo inside at least one of the containers. The day before Saba's son arrived to retrieve the carpets, .34 inches of rain fell at Dulles. It was discovered that despite the packaging supplied by Air France and despite the extra plastic, the carpets were damp, particularly at the bottoms of the pallets and containers. Further inspection revealed that 86 of the carpets (in 73 bales) had sustained water damage.

Saba sued Air France for the loss. Air France's liability for the damaged cargo is limited by the Warsaw Convention, which provides that "[i]n the transportation of checked baggage and of goods, the liability of the carrier shall be limited to a sum of 250 francs per kilogram." *Convention for the Unification of Certain Rules Relating to International Transportation by Air*, Oct. 12, 1929, Art. 22(2), *reprinted in* 49 U.S.C. app. § 1502, Historical Note (1988). Saba contended, however, that Air France and its agent, Dynair, had engaged in willful misconduct, so the Convention's liability limitation did not apply. Warsaw Convention, Art.

25(1) ("The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his willful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to willful misconduct."). Saba alleged that Air France's packing the carpets in violation of its cargo-handling regulations and Dynair's leaving the carpets outside constituted willful misconduct.

After a bench trial, the district court agreed and awarded Saba damages well in excess of Air France's liability had the Convention been held to apply. The district court opinion, finding willful misconduct, documented a variety of flaws in the packing of the carpets: Air France stacked 40% of the carpets on metal pallets, rather than in enclosed containers as suggested by its own regulations; failed to provide double plastic covers (*i.e.*, cover over and under the cargo) on the palleted carpets as required by its regulations; failed to provide reinforcement to prevent the pallets from deforming under the weight of the carpets as required by its regulations; used containers fitted with net doors, which were doubly inadequate—they were not rigid as required by Air France regulations, and they did not close properly; and used one container that had a three-inch gash in the top. The district court also pointed to the fact that Air France's agent, Dynair, left the badly packaged carpets outside despite publicly forecasted rain and did not bring the carpets inside once it started to rain.

In describing the standard for willful misconduct in this circuit, the district court referred to *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1479 (D.C.Cir.), *cert. denied sub nom. Dooley v. Korean Air Lines, Ltd.*, 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991), in which we upheld the district court's jury instruction that "[w]illful misconduct is the intentional performance of an act with knowledge that the act will probably result in an injury or damage, or in some manner as to imply reckless disregard of the consequences of its performance." *Saba v. Compagnie Nationale Air France*,

866 F.Supp. 588, 593 (D.D.C.1994). The judge interpreted that formulation to mean that "a combination of factors can, taken together, amount to willful misconduct, and that merely the act itself needs to be intended, not the resulting injury or the wrongfulness of the act." *Id.* (citation omitted). He thought, moreover, that "a finding of willful misconduct is appropriate when the act or omission constitutes a violation of a rule or regulation of the defendant carrier itself." *Id.* After reviewing the evidence of Air France's "lack of judgment," *id.* at 594, and "disregard of its own cargo-handling regulations as well as of plain common sense," *id.* at 593, the district court concluded that "through a series of acts, the performance of which were intentional, Air France has demonstrated a reckless disregard of the consequences of its performance." *Id.* at 594.[1] The Warsaw Convention's liability limitations were therefore inapplicable.

## II.

Air France's fundamental argument is that the district judge ignored the difference between misconduct and *willful* misconduct. He treated the case, according to appellant, as if the standard for recovery were negligence, or at most gross negligence, which is all the evidence amounted to. What is missing—and what is essential to recovery under the Warsaw Convention—is any evidence that appellant, or its agent, Dynair, acted with a conscious awareness that its acts or omissions were wrongful. Air France contends that willfulness implies a subjective test, a showing that the defendant knew that its behavior would likely have injurious consequences. The district judge erred, according to appellant, by simply cumulating the mistakes made by Air France and its agent without any evidence that either was aware that its actions would lead, or likely lead, to Saba's injury.

Saba emphasizes that the Convention lifts liability limits if willful misconduct is shown *or* if the actions of the carrier are considered "equivalent to willful misconduct." Under our cases interpreting willful misconduct, we have recognized reckless disregard as an equivalent and therefore appropriate measure. This case, according to appellee, meets that standard, or at least the district judge's conclusion that it did was not clearly erroneous. In that regard, a court may, when determining whether a defendant acted in reckless disregard of consequences, consider a pattern of conduct even if no one action or omission by itself would meet that standard.

To be sure, from our earliest cases under the Warsaw Convention, we have treated reckless disregard as equivalent to willful misconduct. *See, e.g., American Airlines, Inc. v. Ulen,* 186 F.2d 529, 533 (D.C.Cir.1949) (approving jury instruction to effect that "if the carrier, or its employees or agents, willfully performed any act with the knowledge that the performance of that act was likely to result in injury to a passenger, or performed that act with reckless and wanton disregard of its probable consequences, then that would constitute willful misconduct"); *see also In re Korean Air Lines,* 932 F.2d at 1479; *KLM Royal Dutch Airlines Holland v. Tuller,* 292 F.2d 775, 778–79 (D.C.Cir.), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961). But we have never been very clear as to what we meant by reckless disregard. In some of these cases it is not apparent that the conduct involved was beyond negligence, *see, e.g., Tuller,* but we have never *held* that negligence—gross or otherwise—would suffice to make out willful misconduct. Bearing in mind that under the Warsaw Convention a carrier is subject to unlimited liability only if it engages in willful misconduct or its "equivalent," we think it is clear that we have meant—and only could have meant—reckless disregard to serve a limited function: providing a proxy for willful misconduct's scienter requirement. Our use of that term therefore should be taken, not as creating a separate, less onerous exception to limited liability, but

---

1. The judge also observed that Air France failed, after the fact, to prepare a damage report, despite the unprecedented amount of damage. The court recognized that this was not causally connected to the damage, but nevertheless stated that it "emphasized" Air France's disregard and "reveal[ed] much about Air France's regard or lack thereof for its own procedures and its customers' requirements." *Saba,* 866 F.Supp. at 594 & n. 10.

as an effort to alleviate problems of proof of willful misconduct.

Former Chief Judge Robinson of the district court, reviewing our Warsaw Convention cases, recognized as much. Noting the various ways in which we had formulated the standard, Chief Judge Robinson stated that "there are several factors that are constant." *In re Korean Air Lines Disaster of Sept. 1, 1983,* 704 F.Supp. 1135, 1136 (D.D.C.1988). Among these was that "the wrongdoer *must .consciously be aware of his wrongdoing, i.e.,* the actor must not only intend to do the act found to be wrongful but also must *know that his conduct is wrongful.*" *Id.* (emphasis added). He then put his finger on what we think is the crucial point: "As is apparent, however, both by the nature of the problem of proving an actor's intent and by the formulation equating a 'reckless disregard of the consequences' with intentional wrongdoing, the actor's intent may be inferred from indirect evidence and the reckless nature of his acts." *Id.* In other words, besides showing that the defendant intends the act which ultimately causes the harm, a plaintiff must prove that the defendant was subjectively aware of the consequences of his act—not necessarily that it would cause the exact injury, but at least that it was certainly likely to cause an injury to plaintiff.[2] It was in that sense reckless.[3]

There is a continuum that runs from simple negligence through gross negligence to intentional misconduct. Recklessness, or reckless disregard, lies between gross negligence and intentional harm. The critical analytical division between the tort that can be made out through presentation of merely objective evidence—without regard to defendant's state of mind—and one that requires a showing of a subjective state of mind cuts recklessness in half. One meaning of recklessness, then, is simply a linear extension of gross negligence, a palpable failure to meet the appropriate standard of care. *See Farmer v. Brennan,* —— U.S. ——, —— & n. 4, 114 S.Ct. 1970, 1978 & n. 4, 128 L.Ed.2d 811 (1994). The second, as we have recognized in other contexts, is a legitimate substitution for intent to do the proscribed act because, if shown, it is a proxy for that forbidden intent. If it were not used as a proxy, it might be all too easy for the wrongdoer to deliberately blind himself to the consequences of his tortious action. *See, e.g., United States v. Hoffman,* 918 F.2d 44, 46 (6th Cir.1990). Violations of securities laws, for example, require proof of an "intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 & n. 12, 96 S.Ct. 1375, 1381 & n. 12, 47 L.Ed.2d 668 (1976), and "we have determined, along with a number of other circuits, that *extreme* recklessness may also satisfy th[e] intent requirement," *SEC v. Steadman,* 967 F.2d 636, 641 (D.C.Cir.1992) (emphasis added). "The kind of recklessness required [for a violation of the securities laws], however, is not merely a heightened form of ordinary negligence; it is an 'extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvi-

---

**2.** The dissent states that an awareness of the wrongfulness of one's conduct is not the same as an awareness of the bad consequences of one's conduct. Dissent at 671–672, n. 2. In the tort context, we cannot imagine how an action's wrongfulness could be determined other than by reference to its expected consequences (unless the action is independently illegal).

**3.** In *Korean Air Lines,* Chief Judge Robinson carefully reviewed the evidence proffered by both the carrier and the plaintiffs. The plaintiffs' primary theory on which he concentrated was that "the crew of KE 007 *knew* early on that, because of crew error prior to take-off, they were operating without a reliable Inertia Navigation System ..., the primary means of navigating the flight." 704 F.Supp. at 1137 (emphasis added, footnote

omitted). He did, however, refer to plaintiffs' "alternative" theory, which he described variously as "essentially a gross failure of the crew to monitor their course direction," *id.* at 1137 n. 6, as "a reckless failure to monitor and cross-check the [INS]," *id.* at 1147–48, and as an "intentional[ ] fail[ure] to do the mandated cross-checks," *id.* at 1142. The judge did not discuss this theory at any length and did not apparently rely on it in determining that the plaintiffs had produced enough evidence of willful misconduct to withstand summary judgment. His focus on the primary theory that the flight crew *knew* they were off course obviated any need to dwell on the alternative theory, however phrased, and any need to decide whether that theory, standing alone, would permit a finding of willful misconduct.

ous that the actor must have been aware of it.' In other words, it is a 'lesser form of intent.'" *Id.* at 641–42 (citations omitted). *See also Sanders v. John Nuveen & Co, Inc.,* 554 F.2d 790, 792 (7th Cir.1977). Similarly, reckless disregard, in the Warsaw Convention context, requires a showing that the defendant engaged in an act that is known to cause or to be likely to cause an injury.

Our dissenting colleague points to cases that demonstrate the different meanings reckless disregard can have. Dissent at 674. She would choose the one that is merely an extension of gross negligence, which can be satisfied without regard to a defendant's subjective bad purpose. She too looks for analogy to other areas of the law, relying on, *inter alia, Farmer v. Brennan,* —— U.S. at —— ——, 114 S.Ct. at 1978–79, for the proposition that "[t]he civil law generally calls a person reckless who acts . . . in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." But we think that opinion better supports our position. The Court equated "deliberate indifference" in the Eighth Amendment setting with reckless disregard. It noted that in civil law, the definition of recklessness means only that the disregarded risks *should* have been known—an objective test—whereas, in criminal law, where intent is typically required, recklessness means a subjective knowledge of the risks. The Supreme Court concluded that the use of the "criminal law" measure was more appropriate to measure deliberate indifference because it better comported with the prohibition on "punishment." *Id.* at ——, 114 S.Ct. at 1979; *see also Archie v. City of Racine,* 847 F.2d 1211, 1219 (7th Cir.1988), *cert. de-* *nied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989) ("An act is reckless in the pertinent sense when it reflects complete indifference to risk—when the actor does not care whether the other person lives or dies, despite *knowing* that there is a significant risk of death.") (emphasis added). The Supreme Court's reasoning makes quite clear that the key divide is not between nominally "civil" and "criminal" recklessness, but between a means of imposing liability that requires a showing of intent and one that does not.[4]

We think our dissenting colleague both misreads precedent—particularly *Steadman*—and our opinion to conclude that the concept of reckless disregard which meets the subjective standard is satisfied by merely showing an extreme departure from standards of ordinary care. Dissent at 672–673. That would be nothing more than gross negligence. *Steadman,* instead, required that the actor also *know* of the danger to buyers or sellers or that the danger was so obvious "the actor must have been aware of it." In other words, if it can be shown that a defendant gazed upon a specific and obvious danger, a court can infer that the defendant was cognitively aware of the danger and therefore had the requisite subjective intent. Intent can, of course, always be proved through circumstantial evidence. That is by no means the same thing as saying the defendant *should* have known about the danger which is the essential difference between the district court and the dissent's analysis and our own. In this regard, the dissent is exactly correct that we read the Warsaw Convention to limit liability in "situations where a

---

4. Although language in some of the other cases cited in the dissent seems consistent with an objective test, that establishes nothing more than that the term reckless disregard can include a variety of concepts. Judge Wald also relies on two quotations from the Restatement (Second) of Torts for the proposition that the test is not what a carrier knew but what a carrier should have known. Dissent at 674 n. 6. She might have included a third, stating that reckless disregard may be found when an individual "knows or has reason to know . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in *conscious* disregard of, or indifference to, that risk." RESTATEMENT (SECOND) OF TORTS § 500, com- ment. a (1965) (emphasis added). In any event, the cases cited do not support the proposition that, under the Warsaw Convention, the test for reckless disregard is an objective one. In *United States v. Wallace,* 964 F.2d 1214, 1220 (D.C.Cir. 1992), for example, we determined that the actions of a sanctioned attorney amounted to nothing more than negligence, which is insufficient for sanctions, and accordingly had no occasion to decide whether and what kind of recklessness was an adequate proxy for "vexatiousness or bad faith." *Id.* And, in *In re Holloway,* 995 F.2d 1080, 1082 (D.C.Cir.1993), unlike here, we dealt with a statute without an express intent requirement.

reasonable employee should have but did not understand that her actions posed a substantial risk of harm to a shipper's goods." Dissent at 674.

## III.

■ There was no evidence presented in this case that could meet the test of willful misconduct or its equivalent, reckless disregard. There was no showing that either Air France or Dynair employees were subjectively aware of serious risks attending packaging the carpets inadequately in violation of regulations or leaving the carpets outside. Saba did show that Air France's packers in Linz failed to pack the carpets according to Air France's regulations. But he offered no evidence that the packers knew that the cargo was likely to be left outside in inclement weather and that the packaging provided would not adequately protect it.[5] And no evidence was presented that Dynair employees actually expected rain, or knew that if it rained, the packaging provided by Air France, in combination with the heavy-gauge plastic added by Dynair employees (and overlooked by the district court and mentioned only in passing by our colleague), created a grave risk of water damage. Without any such evidence, the inference that Air France or Dynair intended (or recklessly disregarded the high risk of) bad consequences is entirely unwarranted, and willful misconduct, as a matter of law, is not established. However, the district judge, believing it not necessary for Saba to prove that either Air France or Dynair actually apprehended any risks—so long as a reasonable person would have—found that Air France's failure to abide by packaging regulations, its persistent "lack of judgment," and its lapses of common sense constituted willful misconduct. That is simply inadequate.

We rather doubt that the evidence satisfies even Judge Wald's formulation of reckless disregard. She implicitly recognizes the analytical difficulty caused by the district court's bunching together of the actions of two separate corporations, Air France and Dynair, by focusing instead on the behavior of the latter.[6] But Judge Wald does not explain why Dynair's acts—which appear to be at most negligent, see *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947); *Johnson v. Phelan*, 69 F.3d 144, 150 (7th Cir.1995) ("An incorrect assessment of recognized costs and benefits is just negligence....") (citation omitted)—constitute "grievous malfeasance," Dissent at 673, or achieve the Restatement's standards upon which she relies, which require a "high degree of risk," "aggravated risk," or conduct of a "highly dangerous character." Of course, if Judge Wald were correct as to the appropriate standard, the district judge's findings would be entitled to wide latitude under the clearly erroneous standard of review, but it does not seem that he made a significant effort to demonstrate why the evidence passed beyond negligence standards. It is not necessary, however, to evaluate the judge's findings under an objective test; reckless disregard as the equivalent of willful misconduct requires more. Saba did not present such evidence.

\* \* \* \* \* \*

If federal courts have not always focused in Warsaw Convention cases on the distinction between negligence and willful miscon-

---

5. We are not entirely certain as to the relevance of the packaging regulations in a willful misconduct case. Without a great deal more, violation of a safety standard (which we very much doubt these packaging standards could be called) is at best negligence *per se*. See, e.g., *Jeffries v. Potomac Development Corp.*, 822 F.2d 87, 93 (D.C.Cir.1987).

6. Within either corporation, of course, the negligent acts of employees can be fairly imputed to the corporation. Individual acts of negligence on the part of employees—without more—cannot, however, be combined to create a wrongful corporate intent. In *United States v. Bank of*

New England, 821 F.2d 844 (1st Cir.), cert. denied, 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987), for example, corporate knowledge of certain facts was accumulated from the knowledge of various individuals, but the proscribed intent (willfulness) depended on the wrongful intent of specific employees. See id. at 855–56 (upholding jury instructions that "[t]he bank is deemed to have acted willfully if one of its employees in the scope of his employment acted willfully."). Similarly, the acts of an agent (here, Dynair) can be attributed to its principal (Air France). But the agency relationship cannot transform negligence into willfulness.

duct, it may well be because judges (as well as juries) are tempted to view cases before them *ex post* rather than *ex ante, see* EASTERBROOK, *The Supreme Court, 1983 Term—Foreword: The Court and the Economic System,* 98 HARV.L.REV. 4, 10–12 (1984), which is probably the real reason for tort liability creep throughout this century. The district court's opinion strikes us as a subset of that phenomenon, or a variation on that theme. It is not all that easy to avoid the Convention's limitations by establishing willful misconduct (or reckless disregard). But the signatories obviously thought the economics of air travel, and therefore the overall welfare of passengers, dictated those limitations. It simply will not do for courts to chip away at that liability limit, out of a natural desire to remedy the negligence that can be all too apparent in any individual case.

We reverse the district court's judgment and remand with instructions to enter judgment against Air France based on its conceded negligence and limited by the Warsaw Convention.[7]

WALD, Circuit Judge, dissenting:

In the cause of halting the "tort liability creep," the majority reverses the district court's decision that Air France committed "reckless disregard" by leaving Mohammad Ali Saba's ("Saba") improperly packaged carpets out in the rain and so may not avail itself of the Warsaw Convention's liability cap for damaged cargo.[1] The district court first set forth the standard for "reckless disregard" as used in the context of the Warsaw Convention: " 'willful misconduct is the intentional performance of an act with knowledge that the act will probably result in an

injury or damage, or in some manner as to imply reckless disregard of the consequences of its performance.' " *Saba v. Compagnie Nationale Air France,* 866 F.Supp. 588, 593 (D.D.C.1994) (quoting *In re Korean Air Lines Disaster of Sept. 1, 1983,* 932 F.2d 1475, 1479 (D.C.Cir.) [hereinafter "*Korean Air Lines* "], cert. denied sub nom. *Dooley v. Korean Air Lines, Ltd.,* 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991)). It then concluded that the manner in which Air France handled Saba's cargo "demonstrated a reckless disregard of the consequences of its performance." *Id.* at 594. In overturning this ruling, my colleagues make two points. First, finding that the district court misapprehended the correct legal standard for reckless disregard as used in the context of the Warsaw Convention, they advance a new—and to my view, somewhat confusing—"subjective" standard for "reckless disregard." Second, they go on to find that Saba failed to satisfy this subjective test. I disagree on both counts, and accordingly, dissent.

I.

The majority's new standard for reckless disregard first of all lacks precision. Although the majority themselves disparage prior precedent for a lack of clarity, *see* Majority opinion ("Maj. op.") at 667, it seems to me that they only further confuse the question of what a plaintiff bringing suit under the Warsaw Convention must establish to prevail on a claim of reckless disregard. My colleagues repeatedly stress that they are adopting a "subjective" test for reckless disregard in order to preserve its limited

7. We agree with the district court's interpretation of the Convention as to the appropriate measure for determining the amount of damages that Saba may recover. *Saba,* 866 F.Supp. at 594 n. 11.

1. The Warsaw Convention generally limits a carrier's liability for goods damaged in international transit to approximately $9.00 per pound. Article 25 of the Convention, however, allows for recovery of *full* compensatory damages if a carrier engages in "willful misconduct":

The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is

caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.

*Convention for the Unification of Certain Rules Relating to International Transportation by Air,* Oct. 12, 1929, T.S. No. 876 (1934), *reprinted in* 49 U.S.C.App. § 1502 note (1988) [hereinafter "Warsaw Convention"]. As the majority recognizes, this circuit has long interpreted "wilful misconduct" to include "reckless disregard," in line with the English translation of the original French text of the Convention.

function of "providing a proxy for willful misconduct's scienter requirement," *id.* at 667, and claim that permitting a plaintiff to establish reckless disregard solely by presentation of "objective evidence" (presumably evidence that a reasonable carrier would have known of the substantial risk created by her actions, which in turn permits the inference that the defendant *should have known* of this risk), without proof of a defendant's subjective awareness of the likely consequences of her act, would impermissibly broaden this exception to the Convention's liability cap. *Id.* at 668. Yet they never hone in precisely on what their subjective test requires, or how a plaintiff can satisfy it. At some points, the panel opinion seems to suggest that a plaintiff must prove a carrier had actual knowledge that its actions posed a substantial risk of harm,[2] but at other points, it appears to acknowledge that judges or juries may infer this subjective knowledge of consequences from the circumstances of the contested action[3]—a concession that makes their standard in practical terms indistinguishable from the one set forth in our past cases and used by the district court. *See, e.g., Korean Air Lines,* 932 F.2d at 1479 ("[w]illful misconduct is the intentional performance of an act ... in some manner as to

imply reckless disregard of the consequences of its performance"); *KLM Royal Dutch Airlines Holland v. Tuller,* 292 F.2d 775, 778 (D.C.Cir.), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961) (same); *American Airlines, Inc. v. Ulen,* 186 F.2d 529, 533 (D.C.Cir.1949) ("[a] violation [of safety rules] ... done with a wanton and reckless disregard of the consequences" constitutes willful misconduct); *Saba,* 866 F.Supp. at 593 ("willful misconduct is the intentional performance of an act ... in some manner as to imply reckless disregard of the consequences of its performance"). In these parts of the opinion, the majority draws from other areas of the law, such as securities law: " '[this] kind of recklessness ... is an *extreme departure from the standards of ordinary care,* ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is *so obvious that the actor must have been aware of it.*' " Maj. op. at 668 (quoting *SEC v. Steadman,* 967 F.2d 636, 641–42 (D.C.Cir.1992) (internal quotations omitted; emphasis added)). *Steadman* does indicate that the level of risk created by the actor must be "extreme" in order to qualify as reckless disregard. Contrary to the majority's reading, however, it does not provide an unqualified escape hatch for a defendant

2. The majority quotes a district court opinion affirming a finding of reckless disregard based on the intentional actions of a carrier for the proposition that " 'the wrongdoer must consciously be aware of his wrongdoing, i.e., the actor must not only intend to do the act found to be wrongful but also must know that his conduct is *wrongful.*' " Maj. op. at 668 (quoting *In re Korean Air Lines Disaster of September 1, 1983,* 704 F.Supp. 1135, 1136 (D.D.C.1988) (emphasis added)). The majority then paraphrases the district court's opinion with approval as follows: "besides showing that the defendant intends the act which ultimately causes the harm, a plaintiff must prove that the defendant was subjectively aware of the *consequences* of his act—not necessarily that it would cause the exact injury, but at least that it was certainly likely to cause an injury to plaintiff." *Id.* (emphasis added). Although both these sentences suggest that a plaintiff must prove actual awareness on the defendant's part, they also pose an additional conundrum for future litigants: awareness of what? To the extent that the term "wrongful" encompasses a judgment about the morality of one's action, not simply an understanding of its likely consequences, *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2642 (1976) (defining "wrongful" as

"injurious, unjust, unfair"); *see also id.* at 2641 (a wrong act is one that is "immoral" or "unethical"), awareness of the wrongful nature of one's conduct and awareness of the consequences of one's actions are certainly not the same thing. Nor are the two terms coterminous if "wrongfulness" is understood as referring to the legality of an action. For instance, an actor may realize that running a red light at midnight on a lonely road is "wrongful," in that it is illegal, but be blissfully unaware of any likelihood of disaster until a truck comes barreling over the hill and into the intersection at top speed.

3. In suggesting that subjective knowledge can be inferred from the actions of a carrier, the majority quotes further from the district court's *Korean Air Lines* opinion: "As is apparent, however, both by the nature of the problem of proving an actor's intent and by the formulation equating a 'reckless disregard of the consequences' with intentional wrongdoing, the actor's intent may be inferred from indirect evidence and the reckless nature of his acts." *Id.* (quoting *Korean Air Lines,* 704 F.Supp. at 1136); *see also* Maj. op. at 668 (reckless disregard functions "as an effort to alleviate problems of proof of willful misconduct").

who counters with evidence that he did not understand the likely consequences of his actions. Instead, it stands only for the proposition that if a defendant has taken steps to discern these consequences—in Steadman's case, securing a legal opinion that federal SEC rules did not require him to "book" liabilities for non-compliance with state securities laws—then his failure to obtain additional information or to accurately predict those consequences, while perhaps negligent, cannot be adjudged "extremely reckless." *Steadman*, 967 F.2d at 641–42 (finding Steadman's company did not act with extreme recklessness because its decision not to register under state laws or book liabilities for failure to do so was based on "formal, unqualified opinion letter" from attorney, which was also relied upon by "a partner at one of the country's largest accounting firms who had substantial expertise in mutual fund accounting and auditing"). Thus, even in *Steadman*, the standard ultimately still turns on how the actor's behavior comports with an *objective* standard of ordinary care.

In sum, the majority's "subjective" standard of reckless disregard requires awareness by the carrier of the likely consequences of its actions, but permits an inference of that state of mind from circumstances in which the carrier departs in an extreme fashion from standards of ordinary care. I agree that either direct or circumstantial evidence of this kind of heedless indifference may suffice to show reckless disregard. I also agree that it takes a grievous malfeasance to justify an inference of reckless disregard. A *de minimis* departure from standards of ordinary care would not suffice; if, for example, a carrier directed its cargo handlers to cover the bottom of a pallet with a plastic sheet that reaches 3 feet up the edge of the pallet, but the handler used a sheet that was an inch too short, this departure from ordinary care might constitute negligence, but would certainly not be extreme enough to warrant a finding of reckless disregard.[4] But my basic problem is that this is already the law, the same law we have long applied in this court and that the district court applied here.

In at least two past cases, this circuit has based a finding of "reckless disregard" on objective evidence that the carrier should have known its actions posed a substantial risk of harm. The majority admits as much, but tries to sweep away these precedents by declaring that "[i]n some of these cases it is not apparent that the conduct involved was beyond negligence, but we have never *held* that negligence—gross or otherwise—would suffice to make out willful misconduct." Maj. op. at 667 (citation omitted). I'm not at all sure what that means. Where does gross negligence end and extreme departure from ordinary care begin? My colleagues do not see fit to enlighten me, but I think it worthwhile to look to precedent for the answer. In *Ulen*, this court upheld a jury verdict of reckless disregard based on evidence showing that the aircraft's pilot caused the plane to crash by devising and executing a flight plan which called for the plane to fly at an altitude of 4,000 feet, over a mountain with an elevation of 4,080 feet. The court did so despite claims by the carrier that the pilot had not known the height of the mountain, had flown this course several times before, and had identified a safe course that would fall within the parameters of the plan but still avoid crashing into the mountain—all of which suggest that although a reasonable pilot would know of the substantial risks posed by the flight plan, the carrier's pilot could certainly not have been aware of the likely consequences of his actions. Similarly, in *Tuller*, then-Circuit Judge Burger sustained a verdict of reckless disregard based on the actions of several employees: one turned off a radio on the ground that monitored messages from the aircraft and then failed to advise the appropriate officials of a

---

4. The district court, in setting forth the standard for reckless disregard, stated that "a finding of willful misconduct is appropriate when the act or omission constitutes a violation of a rule or regulation of the defendant carrier itself." *Saba*, 866 F.Supp. at 593 (citing *Bank of Nova Scotia v. Pan American Airlines*, 16 Avi. 17, 378 (S.D.N.Y. 1981)). Not every violation of a carrier's rule or regulation rises to the level of reckless disregard, however. As explained in the text, a carrier's failure to comply with its own rules and regulations constitutes reckless disregard only if the violation represents an extreme departure from the standard of care mandated by the regulation.

break in radio contact as soon as he became aware of the problem; another failed to fasten his seat belt as required by regulations, and was thus unable to send a distress signal after being thrown from his seat; others failed to instruct passengers about the location or use of life vests in the plane; and still others failed to take adequate steps to rescue an imperiled passenger after the plane crashed. With respect to none of these actions did the court mention any evidence that the carrier's employees actually appreciated the risk their actions created; the only logical inference is that their behavior was reckless because any reasonable airline employee would have realized that such acts (or omissions) posed a grave risk of harm.[5] Other areas of law employ a similar standard for findings of recklessness, so that parties cannot "evade liability through deliberate ignorance or careless disregard of the accuracy and veracity of their claims." *United States v. TDC Management Corp., Inc.*, 24 F.3d 292, 297 (D.C.Cir.1994); *see also Farmer v. Brennan*, —— U.S. ——, ——, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994) ("The civil law generally calls a person reckless who acts ... in the face of an unjustifiably high risk of harm that is either known or *so obvious that it should be known.*" (emphasis added; citations omitted)); *In re Holloway*, 995 F.2d 1080, 1082 (D.C.Cir.1993) (wrongful intent in context of contempt proceedings requires " 'a volitional act done by one who

knows or *should reasonably be aware that his conduct is wrongful* ' " (quoting *United States v. Greyhound Corp.*, 508 F.2d 529, 531–32 (7th Cir.1974) (emphasis added)), *cert. denied*, —— U.S. ——, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994); *United States v. Wallace*, 964 F.2d 1214, 1220 (D.C.Cir.1992) (sanctionable attorney conduct "requires deliberate action in the face of a known risk, the likelihood or impact of which the actor inexcusably underestimates or ignores").[6]

In conclusion, I cannot fathom what the majority's "subjective" standard adds to our circuit precedent, which already permits a court to find reckless disregard if a carrier's performance deviates so significantly from standards of ordinary care as to imply reckless disregard for the consequences of its action. The only result it might accomplish, in theory, is to exclude from the definition of "reckless disregard" those situations where a reasonable employee should have but did not understand that her actions posed a substantial risk of harm to a shipper's goods. *Cf. Steadman*, 967 F.2d at 642. But this rule would permit a carrier to systematically handle its shippers' goods with virtually total disregard for their security, if it can show that its employees lacked subjective knowledge of the risk they have created. The resulting not-so-benign neglect will cost the carriers almost nothing—$9.00 per pound of

---

5. In *Korean Air Lines*, our most recent case concerning the Convention's liability cap, this court found sufficient evidence to support a verdict of reckless disregard based on plaintiffs' allegations that a flight crew had *deliberately* concealed repeated deviations from its flight path to avoid disciplinary sanctions. In approving plaintiffs' theory of "actual knowledge" of risk (termed the "primary theory" by the majority), however, the *Korean Air Lines* court at no point suggested that such knowledge was necessary to a finding of reckless disregard. Thus, contrary to the majority's characterization of the case, *see* Maj. op. at 668 n. 3, the district court did not disavow the *Korean Air Lines* plaintiffs' "alternative theory" of reckless disregard, which was based on failure to adhere to objective standards of reasonable care.

6. This standard is also consistent with the Restatement (Second) of Torts, which defines "reckless disregard" as including

an act ... [performed] knowing or *having reason to know of facts which would lead a reasonable man to realize*, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

RESTATEMENT (SECOND) OF TORTS § 500 (1965) (emphasis added). The Restatement makes clear that an individual may be liable for reckless disregard if she

has such knowledge, or reason to know, of the facts, but *does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so.* An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.... It is enough that he knows or has reason to know of circumstances which would bring home to the realization of the ordinary, reasonable man the highly dangerous character of his conduct.

*Id.* § 500 cmt. a, c (emphasis added).

damaged goods—at least until their reputation suffers so much that transit revenues drop, but it will expose shippers to egregious risks of harm without adequate compensation.

And in practice, the subjective test will never stray far afield from the objective one. If the majority concedes the legitimacy of an inference of subjective knowledge of consequences from extreme circumstances, the dividing line between these two standards all but evaporates. Since intent can be inferred from circumstances, we are really saying to parties that if your behavior deviates substantially from the norm, we will assume that you knew your actions created a very substantial risk of harm to others. Although the majority might in individual cases require a more extreme departure from ordinary care in order to infer subjective awareness of substantial risk than that required in our past cases, or by the district court here, the difference between its construction of reckless disregard and the district court's comes down in the end to just that—how badly a carrier must behave before an inference of subjective knowledge of likely disastrous consequences will be permitted. I think the district court got it right—both the standard for reckless disregard, and the amount of "bad behavior" needed to make the required inference of reckless disregard—under existing law and sound tort principles.

## II.

My second problem with my colleagues' opinion is this: even assuming that a plaintiff seeking relief from the Warsaw Convention's liability limits must show that the carrier was subjectively aware of the substantial risk created by its actions, either through direct or circumstantial evidence, it would not have

been clearly erroneous for the district court to infer from the evidence presented at this trial that Dynair employees working at Dulles Airport knew Saba's obviously ill-packaged carpets were substantially likely to be damaged if left outside in the rain. Thus, even under its "subjective" standard for reckless disregard, the majority should have affirmed the district court's ruling for Saba.[7]

Air France instructs its employees in minute detail how to package humidity- or weather-sensitive cargo. *See* Air France Aircraft Handling and Loading Operational Regulations, *reprinted in* Joint Appendix at A47–A68. These guidelines, characterized in Air France's cargo handling manual as "a must in order to ... avoid the risk of damage to packages and ensure quality of service to cargo customers," *id.* at 1, explain to its cargo handlers how to transport shipped goods so as to minimize the possibility of damage. For example, they direct handlers to transport cargo in containers rather than on pallets, "if the nature of cargo justifies it: [*e.g.,*] cargo to be fully protected against weather," *id.* at 4, or if the cargo is likely to create an unstable stack, such as "rolls of textiles," *id.* at 17, 18. The cargo handlers' manual also includes extensive guidelines for safeguarding pallet cargo against the elements. All cargo pallets "must be protected from weather by a cover (plastic sheet 4 to 6 m/15 to 20 ft wide) installed over the top and the sides before installing the net"; accompanying illustrations show a cover which fully protects the sides and is secured to the edges of the pallet base. *Id.* at 20. This single covering is sufficient to protect "metal containers or any cargo which is not sensitive to humidity," but humidity-sensitive cargo, including "carpet [and] rugs," requires the additional protection of a double cover. *Id.*

---

7. The majority mischaracterizes the district court's opinion as finding Air France guilty of mere negligence, rather than reckless disregard. This argument is a proverbial red herring. To be sure, the district court at various points described Air France's actions as displaying a "lack of judgment," *Saba*, 866 F.Supp. at 594, and as showing "disregard of its own cargo-handling regulations as well as of plain common sense," *id.* at 593. Although these statements by themselves could be read as suggesting that the court need only find negligence in order to rule for

Saba, it is clear from other parts of its opinion that the district court clearly understood reckless disregard to require more than mere negligence. *See id.* at 594. Because the court identified the correct standard there, its remarks are more reasonably interpreted to mean not that Air France was guilty only of negligence, but that it had departed so significantly from the appropriate standard of care as to violate basic rules of common sense to which any ordinary person would adhere.

The guidelines stipulate that it is particularly important to "protect the lower parts of the pallet, where accumulating water often results in damage." *Id.* The illustrations and directions accompanying the guidelines instruct employees to spread a plastic sheet over the base of the pallet with an excess of three feet of sheeting around the edges, before any packages are loaded. After the stack reaches a height of about three feet, the bottom sheet must be folded up to cover the stack and secured with tape or staples if necessary. The top packages are then loaded, another plastic sheet is placed on top and affixed to the stack, and the entire pallet is covered with a net that fastens to the pallet base. *Id.* at 21. The regulations also describe at some length how to load goods on a pallet and cover the pallet for travel, cautioning that a load must be distributed evenly over the pallet to avoid deformation of the pallet's base. *Id.* at 14.

A review of the record fully corroborates the district court's finding that Air France did not even come close to complying with these cargo handling regulations when it packaged Saba's carpets. Even though the airbills identified the cargo contents as carpets—a humidity-sensitive item—Air France loaded some of them onto pallets, shipping the carpets on two pallets and three containers. *Saba,* 866 F.Supp. at 590, 593–94. Air France did not provide a double cover for the pallets or completely cover the tops and sides of pallets with a single plastic sheet, as required by its own handling regulations. *Id.* at 594. At trial, Saba testified that the first pallet he unwrapped at Dulles Airport was "loosely" covered with plastic across the top and first two or three layers of bales. Transcript ("Tr.") of Jan. 25, 1993, at 27; *see also* Tr. of Jan. 25, 1993, at 118 (testimony of Linda Nakumura, Customs Inspector). The bottom of the pallet was not covered with any plastic sheeting. *Id.* at 33 (testimony of Saba); *see also id.* at 145 (testimony of Mitchell). The second pallet was also covered with a "loose piece of plastic tied down by just a block on the top." *Id.* at 33; *see also id.* at 146. Under the plastic was net-

ting, as well as a piece of plastic that came half-way down the sides of the stack. *Id.* at 34; *see also id.* at 147–48. As with the first pallet, Saba found no plastic covering on the bottom. *Id.* at 35; *see also id.* at 150. Nor had Air France reinforced the floor of the pallets with wooden blocks or other supports as recommended in its regulations, which may have contributed to the puddles of standing water on the floor of the pallets. *Saba,* 866 F.Supp. at 594. The containers did not fare much better. Air France used net doors to cover the containers' openings, rather than rigid ones. The doors on all three containers hung open at the top, creating a gap of "four feet or five feet," Tr. of Jan. 25, 1993, at 94, and leaving the interior "completely exposed," Tr. of Jan. 25, 1993, at 37; *see also id.* at 153–57. The top of one container also had a hole of about three inches in diameter. *Id.* at 156; *see also Saba,* 866 F.Supp. at 594.

The record indicates that these packaging problems were so conspicuous as to be immediately apparent to an observer on either side of the Atlantic. Yet despite these manifest deficiencies, when the carpets arrived at Dulles, Dynair employees stored the carpets outside for five days until Saba picked them up on October 1, 1990,[8] placing only an extra sheet of plastic loosely on the top part of the two pallets. During this time, .34 inches of rain—a rainfall described by a Dynair employee as "a hell of a rainstorm," Tr. of Jan. 25, 1993, at 144—fell at Dulles Airport. *Saba,* 866 F.Supp. at 590. As a result of exposure to the rain, a large number of the rugs were soaking wet when Saba retrieved them, particularly those on the bottom and sides of each stack. *Id.* at 592. As each pallet was unloaded, Saba discovered approximately one-half inch of standing water in the pallet's basin, and a depression in the center, where still more water had collected. In the containers, the bales close to the door were soaked, while those farther on the inside remained dry. Tr. of Jan. 25, 1993, at 38. After drying the carpets out, Saba found that 86 of the carpets had sustained permanent

---

8. At trial, Barfield Mitchell testified that Dynair's explanation for storing the carpets outdoors was that they "couldn't get it into the warehouse

because of the fact we didn't have any room in the warehouse, and we had to leave it out back." Tr. of Jan. 25, 1993, at 159.

water damage, an estimate later confirmed by Air France's own appraiser. *Saba,* 866 F.Supp. at 592.

It seems indisputable to me that on the basis of this evidence, the district court was warranted in drawing two conclusions: first, that the violations of Air France's cargo handling regulations and the resulting woefully inadequate packaging of the cargo were so substantial and obvious to the Dynair employees who placed them outdoors as to make their awareness of the potentially damaging consequences from rain undeniable[9]; and second, that storing carpets packaged this way outdoors, despite a forecast of rain, was such an extreme departure from ordinary standards of care as to warrant, if not mandate, an inference that Dynair employees had to recognize the substantial risk created by their actions. The majority suggests that the district court predicated its finding of reckless disregard on a combination or cumulation of isolated, minor mistakes made by Air France employees in Austria and Air France agents employed by Dynair at Dulles Airport.[10] Maj. op. at 666, 670. I read the district court's line of reasoning differently, as resting on the fact that the deficiencies in packaging were so apparent to the plain eye that Air France's agents at Dulles had to have recognized the packaging problems and known that the carpets would almost certainly sustain water damage if stored outdoors when rain was forecast. Thus, even under the reckless disregard standard set forth by the majority (as best I can understand it), the district court's ruling for Saba should have been affirmed.

\*　　\*　　\*

The majority tips its hand in cautioning against the use of an *ex post* perspective, which compensates plaintiffs because their injuries arouse our sympathies, instead of an *ex ante* vantage point which looks to the impact of a judicial decision on overall social welfare. The property damage sustained by Saba in this case does not, of course, equate with the harm suffered by passengers and their families in prior Article 25 cases adjudicated by this court. Faced with property damage instead of death or severe bodily injury, it is perhaps tempting to cut back on precedent which establishes a broader standard for reckless disregard and use this case as an opportunity to curtail the tort liability of air transport companies. But such an *ex ante* calculus inevitably slights the interests of future passengers and shippers who will bear the burden of this decision. If we absolve Air France today from the duty of compensation for its egregious disregard of a shipper's goods, we cultivate a culture of "benign neglect," forcing customers to shoulder the costs of cumulative negligence of many employees performing compartmentalized functions which nevertheless culminate in a grievous risk to the passenger or shipper. My colleagues cite the specter of "creeping tort liability"—I worry about "creeping unaccountability." I respectfully dissent.

---

9. Testimony by Air France's own cargo surveyor confirms this conclusion; at trial, the surveyor stated that "a shipment packaged this way should not be placed in an open area with the threat of rain because it could be wet damaged." *Saba,* 866 F.Supp. at 594.

10. The majority describes this line of reasoning as "the district court's bunching together of the actions of two separate corporations, Air France and Dynair," Maj. op. at 670. Dynair, however, acted as Air France's agent at Dulles Airport, *Saba,* 866 F.Supp. at 590, and thus under basic principles of agency law Air France is liable for Dynair's handling of Saba's carpets—a point not contested by Air France in its briefs to this court.