**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BAYER CORPORATION,
Plaintiff-Appellant,

v.                                                  No. 99-1408

BRITISH AIRWAYS, PLC,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-98-541-A)

Argued: March 1, 2000

Decided: April 17, 2000

Before WILKINSON, Chief Judge, and WIDENER
and TRAXLER, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Widener and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Thomas Mark Eagan, MALOOF & BROWNE, L.L.P.,
New York, New York, for Appellant. Diane Westwood Wilson,
CONDON & FORSYTH, L.L.P., New York, New York, for Appel-
lee. **ON BRIEF:** James G. Hnat, II, CONDON & FORSYTH, L.L.P.,
New York, New York; Thomas J. Whalen, David F. Rifkind, CON-
DON & FORSYTH, L.L.P., Washington, D.C., for Appellee.

_____

**OPINION**

WILKINSON, Chief Judge:

Bayer Corporation brought this suit against British Airways under the Warsaw Convention, alleging that British Airways was responsible for the spoilage of Bayer's goods. The district court granted partial summary judgment to Bayer, but limited recovery to $6,110. The court limited Bayer's recovery because it found that British Airways had not engaged in "wilful misconduct" under article 25 of the Convention. We now affirm the judgment.

I.

Bayer Corporation contracted with British Airways to transport seventy cartons of medical products (PSA reagents used in diagnosing cancer) from London Heathrow Airport in England to Dulles International Airport in Virginia. Before the flight, the reagents were packed in wet ice. The air waybill noted, "PACKED IN WET ICE, STORE BETWEEN 2-8 DEGREES C, DO NOT FREEZE." While the seventy cartons of reagents bore labels stating "REFRIGERATE, DO NOT FREEZE, URGENT, FRAGILE MEDICAL SUPPLIES," the labels did not note how long the reagents would be safe without refrigeration. Unbeknownst to British Airways, the reagents had an unrefrigerated shelf life of only five days.

The shipment left Heathrow on May 28, 1996, and arrived at Dulles that same day after business hours. British Airways placed the cargo in its unrefrigerated warehouse -- just as British Airways had done with past Bayer shipments. With these past shipments, Bayer's customs broker, Airschott, had timely picked up the temperature-sensitive cargo. Because of these past dealings, both Bayer and Airschott were aware that British Airways did not provide refrigerated storage at Dulles. Airschott, in fact, reminded Bayer in writing three weeks before the instant shipment that "British Airways has no cooler."

British Airways notified Airschott of this most recent arrival on the morning of May 29. Airschott applied for U.S. Customs clearance,

2

and the shipment was approved for importation the next day. Contrary to the course of conduct established among the parties, Airschott did not immediately pick up the cargo. As a result, a British Airways employee asked an Airschott employee why the shipment had not been picked up. Finally, on June 6 -- nine days after the reagents were transported to the United States -- Airschott removed the reagents from the unrefrigerated British Airways warehouse. As a result of the reagents' being unrefrigerated for nine days, the shipment was determined to be a total loss.

On November 20, 1997, Bayer brought suit against British Airways in the United States District Court for the Southern District of New York. Bayer alleged that British Airways had breached its duties under the Warsaw Convention -- the commonly used name for the Convention for the Unification of Certain Rules Relating to International Transportation by Air. Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), reprinted in note following 49 U.S.C. § 40105 (1994). The Warsaw Convention provides the rules of liability for "all international transportation of persons, baggage, or goods performed by aircraft for hire." Id. art. I.

By consent order, Bayer's suit was transferred to the Eastern District of Virginia. Bayer then commenced a separate action against Airschott, and the two suits were consolidated. The case against Airschott was dismissed when Bayer accepted Airschott's settlement offer. Both Bayer and British Airways filed motions for summary judgment.

On February 19, 1999, the district court granted partial summary judgment to Bayer and denied British Airways' motion. The court found British Airways liable under the Warsaw Convention. The court noted that Bayer's reagents were damaged while under British Airways' control and that British Airways had not taken all reasonable steps to protect the cargo. The court also found that Airschott was not the agent of Bayer, and its actions therefore could not be imputed to Bayer, and that Bayer itself was not negligent.

The district court concluded, however, that article 22 of the Warsaw Convention limited British Airways' liability to $20 per kilogram for the 355.5 kilogram shipment. Bayer argued for the application of

3

article 25 of the Convention, which created an exception to article 22's liability limitation when a defendant has engaged in "wilful misconduct." But the district court concluded that Bayer could not show "wilful misconduct" on the part of British Airways. As a result, the court granted Bayer a recovery of only $6,110 -- $20 per kilogram minus the $1,000 Airschott had already paid Bayer. Bayer now appeals the district court's holding that British Airways did not engage in "wilful misconduct."

II.

At the time Bayer brought this suit, article 25 of the Warsaw Convention provided: "The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his <u>wilful misconduct</u> or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct." (emphasis added).

On September 28, 1998, the United States Senate ratified Montreal Protocol No. 4 to the Warsaw Convention. <u>See</u> Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw on October 12, 1929, as amended by the Protocol Done at the Hague on September 8, 1955, <u>reprinted in</u> S. Exec. R. No. 105-120, at 21-32 (1998). This protocol clarifies what article 25 meant by "wilful misconduct."* The Protocol states, "the limits of liability specified in Article 22 shall not apply if it is proved that the damage resulted from an act or omission of the carrier, his servants or agents, <u>done with intent to cause damage or recklessly and with knowledge that damage would probably result</u>." <u>Id.</u> at 29 (emphasis added).

_____

*As the Protocol "clarifies" the article 25 "wilful misconduct" standard rather than substantively changing it, the amendment can be considered "an accurate restatement of prior law." <u>Piamba Cortes v. American Airlines, Inc.</u>, 177 F.3d 1272, 1283 (11th Cir. 1999); <u>see also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng</u>, 119 S. Ct. 662, 674 (1999). The Protocol also makes the article 25 exception inapplicable to goods, although it still applies to passengers and baggage. British Airways does not argue that this substantive change applies to Bayer's suit.

4

On a <u>mens rea</u> spectrum from negligence to intent, article 25's standard is very close to the intent end. <u>See Piamba Cortes v. American Airlines, Inc.</u>, 177 F.3d 1272, 1290-92 & n.13 (11th Cir. 1999). Negligence will not suffice, nor even recklessness judged objectively. Rather, a plaintiff must show that a defendant either intended to cause the damage or acted recklessly with <u>subjective</u> knowledge that the damage would probably result. "[W]hile an objective test asks whether an actor `should have known' of an obvious risk, the subjective test requires, at a minimum, a showing that the actor `must have known' of the risk." <u>Id.</u> at 1291.

Pre-Protocol case law interpreting "wilful misconduct" also stressed the "heavy burden" facing plaintiffs. <u>Branyan v. KLM</u>, 13 F.R.D. 425, 427 (S.D.N.Y. 1953). For example, the Ninth Circuit has defined "wilful misconduct" as "the intentional performance of an act with knowledge that the . . . act will probably result in injury or damage or the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences." <u>Johnson v. American Airlines, Inc.</u>, 834 F.2d 721, 724 (9th Cir. 1987) (internal quotation marks omitted). Other courts have interpreted "wilful misconduct" using similar language. <u>See, e.g.</u>, <u>Saba v. Compagnie Nationale Air France</u>, 78 F.3d 664, 666 (D.C. Cir. 1996); <u>Butler v. Aeromexico</u>, 774 F.2d 429, 430 (11th Cir. 1985); <u>Berner v. British Commonwealth Pac. Airlines</u>, 346 F.2d 532, 536-37 (2d Cir. 1965). The cases have repeatedly held that negligence, even gross negligence, would not satisfy this standard. <u>See, e.g.</u>, <u>Saba</u>, 78 F.3d at 667-70; <u>Perera Co. v. Varig Brazilian Airlines, Inc.</u>, 775 F.2d 21, 23-24 (2d Cir. 1985). And many courts -- just as under the Montreal Protocol -- have held that a plaintiff needs to prove that a defendant was subjectively aware that its actions probably would result in damage. <u>See, e.g.</u>, <u>Saba</u>, 78 F.3d at 667-70 (It"is essential to recovery under the Warsaw Convention [that a defendant] acted with a conscious awareness that its acts or omissions were wrongful."); <u>Berner</u>, 346 F.2d at 536-37; <u>Tokio Marine & Fire Ins. Co. v. United Air Lines</u>, 933 F. Supp. 1527, 1534 (C.D. Cal. 1996).

The rationale for such a high threshold was explained by the District of Columbia Circuit -- "It is not all that easy to avoid the Convention's limitations by establishing willful misconduct . . . . But the signatories obviously thought the economics of air travel . . . dictated

5

those limitations. It simply will not do for courts to chip away at that liability limit, out of a natural desire to remedy the negligence that can be all too apparent in any individual case." Saba, 78 F.3d at 671.

Bayer and British Airways, however, were not locked into article 22's liability limitation. The limitation serves only as a default rule. Article 22 limits British Airways' liability to $20 per kilogram unless Bayer had made, "at the time when the package was handed over to the carrier, a special declaration of the value at delivery and has paid a supplementary sum if the case so requires." Thus Bayer and British Airways could have bargained out of the liability limitation. It is undisputed, however, that Bayer neither declared special value nor paid any supplementary sum with regard to this shipment. As a result, unless Bayer can satisfy its burden under article 25, its recovery is limited to $6,110.

III.

Bayer argues that British Airways cannot avail itself of article 22's liability limitation because British Airways engaged in "wilful misconduct."

We disagree. In light of the following three undisputed facts, Bayer cannot satisfy its "heavy burden" of showing "wilful misconduct" as defined under either the Montreal Protocol or pre-Protocol case law.

First, both Bayer and Airschott were on notice that British Airways could not provide and was not expected to provide refrigeration at its Dulles warehouse. In fact, British Airways had not had refrigeration capability at Dulles for more than twenty years. And Bayer and Airschott were repeatedly informed of this fact -- the last such notice to Bayer came three weeks before the shipment at issue here.

Second, the reagents were packed in wet ice, and British Airways was never informed of their unrefrigerated shelf life. The packaging also failed to identify the shelf life of the reagents.

Third, the morning after the shipment arrived at Dulles, British Airways notified Airschott. In the past when British Airways had notified

Airschott of the arrival of a Bayer shipment, Airschott had promptly picked it up. Thus, according to the previous dealings among these parties, once British Airways informed Airschott of the shipment's arrival, the ball was in Airschott's and Bayer's court. Here, British Airways even went beyond its obligations under the established course of conduct by subsequently asking Airschott why it had not yet picked up the shipment.

Bayer makes much of the fact that British Airways personnel walked past the packaged reagents 10-50 times a day for nine days and observed the temperature-sensitive nature of the shipment. But this is not enough in itself to establish "wilful misconduct." As the district court noted, British Airways could have taken further steps to ensure the cargo's protection. For example, British Airways could have contacted Bayer when the reagents were not picked up after a few days or made further inquiries with Airschott. But saying that British Airways could have taken further steps is a far cry from finding "wilful misconduct." In light of the above undisputed facts, we simply cannot conclude that British Airways has engaged in "wilful misconduct."

Even when confronted with more egregious facts, the District of Columbia Circuit found no "wilful misconduct." In Saba, Air France disregarded its own cargo-handling regulations when packing plaintiff's carpets for shipment. 78 F.3d 664, 670 (D.C. Cir. 1996). When the carpets arrived in the United States, Air France's cargo agent decided to leave them outside its warehouse for five days, despite forecasted rain. Even when it did rain, the agent did not bring the carpets inside. While the conduct by Air France and its agent may have constituted gross negligence, the court found no"wilful misconduct." Id. at 670. It is even clearer that there was no"wilful misconduct" in this case.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.