**Rubina HUSAIN, individually and as personal representative of the estate of Abid M. Hanson, M.D.; Hannah Husain; Sarah Husain and Isaac Husain, minors, by and through their Guardian ad Litem, Rubina Husain, Plaintiffs,**

v.

**OLYMPIC AIRWAYS, Defendant.**

**No. C 99–1400 CRB.**

United States District Court,
N.D. California.

Oct. 3, 2000.

Gerald C. Sterns, Sterns & Walker, Oakland, CA, for Plaintiffs.

Stephen J. Fearon Jr., Robert J. Saville, Condon & Forsyth LLP, Los Angeles, CA, John Maggio, Condon & Forsyth, New York City, for Defendant.

### AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

BREYER, District Judge.

On an international passenger flight in January 1998, Dr. Abid M. Hanson, a non-smoker who suffered from asthma, inhaled a significant amount of second-hand smoke and died in the company of his wife and three children. Dr. Hanson was not seated in the "smoking" section of the airplane on which he died, but in a seat three rows ahead. Considerable ambient smoke was present at this location. Had Olympic Airways' flight crew responded appropriately to the repeated requests to move Dr. Hanson from this area, he might be alive today.

Plaintiffs Rubina, Hannah, Sarah and Isaac Husain bring this wrongful death action under the liability provisions of the Warsaw Convention. The parties agree that the Warsaw Convention presents plaintiffs' exclusive remedy. Therefore, to determine liability in this case, the Court must decide whether plaintiffs' claim satisfies the requirements of that treaty. Specifically, the Court must decide: (1) whether an "accident" occurred aboard Olympic Airways Flight 417 on January 4, 1998; (2) whether that accident caused the death of Abid Hanson; (3) whether the crew's in-flight actions constituted "willful misconduct"; and (4) to what extent, if any, Dr. Hanson's own negligence contributed to his death.

Plaintiffs filed this suit in state court on December 24, 1998, and defendant removed the case to this Court on March 23, 1999. The Court heard testimony and received evidence in this case on May 30, May 31, and June 1, 2000.[1] After receiving the parties' post-trial briefs, the Court heard final arguments on July 20, 2000. Supplemental letter briefs were submitted shortly thereafter. This memorandum and order shall constitute the Court's findings of fact and conclusions of law in this matter.

### FACTUAL BACKGROUND

*I. Dr. Hanson's Medical History*

Dr. Abid Hanson was 52 years old in January 1998. For more than two decades prior to his death, Dr. Hanson suffered from asthma. Although Dr. Hanson did not receive regular treatment for his condition, he carried a Proventil/Albuterol inhaler on his person most of the time to assist his breathing. According to the testimony of Dr. Hanson's wife, Ms. Rubina Husain, Dr. Hanson used his inhaler more and more frequently as he aged. Perhaps as a result of his asthmatic condition, Dr. Hanson was particularly sensitive to second-hand cigarette smoke, and he generally tried to avoid smoke-filled areas. Prior to January 4, 1998, Dr. Hanson had never been affected by cigarette smoke during domestic or international air travel.

In addition to his asthma, Dr. Hanson suffered from multiple food allergies. The evidence is somewhat unclear regarding

---

1. The Court's subject matter jurisdiction over Olympic Airways derives from the Foreign Sovereign Immunities Act, which provides only for non-jury civil actions. 28 U.S.C.A. § 1330(a), 1605.

the extent of Dr. Hanson's allergies, or even the particular foods to which he was allergic. A blood test prior to his death indicated that Dr. Hanson was allergic to grapes, yeast and tomatoes. However, Dr. Hanson frequently ate tomato-based dishes at home without incident.

In the two years preceding Dr. Hanson's death, he suffered two notable medical emergencies of unknown origin. In each instance, the incident may have been precipitated by Dr. Hanson's asthma or by an allergic reaction to certain foods. The most serious incident occurred during a family vacation in Las Vegas in December 1996. One evening, Dr. Hanson and his wife spent approximately ten minutes in a smoky restaurant, shared some cheese pizza and a piece of quiche, and returned to their hotel room. Shortly thereafter, Dr. Hanson began to have trouble breathing. As his breathing difficulties worsened, Dr. Hanson began to turn blue. Ms. Husain performed CPR until the paramedics arrived, at which point Dr. Hanson was administered a shot of epinepherine, a form of adrenaline. After resuscitating Dr. Hanson, the paramedics moved him to the hospital, where he was held overnight. The next morning, Dr. Hanson checked himself out of the hospital against medical advice.

The precise cause of Dr. Hanson's near-fatal experience in Las Vegas is not entirely clear. Although the dry Nevada air or the smoke of the restaurant may have triggered the attack, it was more likely caused by a reaction to certain foods. After reviewing Dr. Hanson's medical records, Dr. Stephen Wasserman, defendant's expert witness, described Dr. Hanson's troubles in Las Vegas as anaphylaxis caused by a severe allergic reaction to food. Plaintiffs' expert, Dr. Jeffrey Golden, agreed, characterizing the episode as "bona fide food-related anaphylaxis."

After the incident in Las Vegas, Dr. Hanson purchased an emergency carrying case containing epinepherine to treat any future attacks. Shortly thereafter, Dr. Hanson experienced a second medical crisis in the summer of 1997, at the home of a friend in Alameda, California. On the evening in question, Dr. Hanson had eaten dinner and then taken a walk outside. Upon Dr. Hanson's return, Ms. Husain noticed that he was having trouble breathing. Fearing that her husband was suffering an asthma attack, Ms. Husain called the paramedics. When they arrived, the paramedics administered oxygen and observed Dr. Hanson for about ten minutes, but did not take him to the hospital. No epinepherine was administered on that occasion.

The cause of Dr. Hanson's breathing problems in Alameda are unknown. Although defendant posits that this second incident was food-related, there is no evidence to support that hypothesis. Equally likely is that the cold dry air which Dr. Hanson breathed during his walk triggered an asthmatic reaction. In either case, the incident in Alameda reveals little about the cause of Dr. Hanson's death aboard Flight 417 six months later.

## II. Dr. Hanson's Death

In late 1997, Dr. Hanson, his wife, Rubina Husain, and their three children ("the Husains") traveled from San Francisco to Athens and Cairo for a family vacation. They were accompanied on their trip by family friends, Dr. Umesh Sabharwal, his wife and their children.

Prior to arriving at the airport, the Husains were unaware that Olympic Airways ("Olympic") permitted passengers to smoke cigarettes on international flights. Upon learning for the first time at the New York airport that their flight would include a smoking section, the Husains requested non-smoking seats. On the 12–hour flight from New York to Athens, the Husains were seated toward the middle or front of the aircraft. On the connecting flight to Cairo, the Husains were again seated away from the smoking section of the cabin. No ambient smoke was present at either location. Dr. Hanson experienced no problems breathing on either flight.

The Husain family spent 12 days in Egypt, and embarked on their return trip to the United States on January 4, 1998. According to the testimony of Ms. Husain, the family arrived at the airport early on the day of the return flight because they wanted to ensure that they would be seated in the non-smoking section. After receiving the family's seat assignments, Ms. Husain returned briefly to the counter and showed the check-in agent a letter signed by Dr. Hanson's brother, also a medical doctor, explaining that Dr. Hanson had a history of asthma. After showing the letter to the agent, Ms. Husain asked the agent to ensure that the family would be seated in the non-smoking section of the plane.

The first leg of the family's return trip was uneventful, but Dr. Hanson began to experience some breathing trouble during a layover in the Athens airport. The layover in Athens lasted approximately three to four hours, and the large room in which the family was seated was filled with cigarette smoke. During the delay, Dr. Hanson used his inhaler more frequently than usual. Because he was bothered by the pervasive smoke, Dr. Hanson attempted to move into the restricted but slightly less smoky area of the first class lounge, but airport officials asked that he move back to the main room.

After the delay, the Husains and the Sabharwals boarded Olympic Airways Flight 417. It was at this time that the Husains first realized that they had been assigned seats at the rear of the airplane cabin, only a few rows in front of the smoking section. The airplane, a Boeing 747, contained a total of 426 passenger seats in 56 rows. Rows one through 13 were designated as business class seats, and rows 14 through 56 were designated as economy class seats. In the economy class, rows 14 through 50 were designated as non-smoking seats. The economy class smoking section began at row 51 and extended to the rear of the cabin. The Husains were seated in row 48 in seats A through E. The Sabharwals were seated nearby. Dr. Husain was seated in seat 48E, just three rows in front of the smoking section. No partition separated the smoking from the non-smoking section.

When the Husains arrived at their seats, Ms. Husain noticed Maria Leptourgou, an Olympic flight attendant, circulating in the cabin and advising passengers to sit down for takeoff.[2] Ms. Husain approached Ms. Leptourgou and told her that her husband could not sit in a smoking area. Ms. Husain said to Ms. Leptourgou, "You have to move him." The flight attendant paid little attention to Ms. Husain's request, telling her to "have a seat."

Once the plane was fully boarded, but prior to takeoff, Ms. Husain again approached Ms. Leptourgou and asked the flight attendant to move her husband now that all the passengers on the plane were seated. This time Ms. Husain explained that her husband was "allergic to smoke." At trial, Ms. Husain described her pre-takeoff requests to the flight attendant as "adamant." Ms. Leptourgou replied that she could not transfer Dr. Hanson to another seat because the plane was "totally full." The flight attendant also told Ms. Husain that she was too busy at the moment to assist the Husains.[3]

---

2. Because Ms. Leptourgou was unavailable to testify at trial and was not deposed for the purpose of this case, the Court never heard her recollection of the events leading up to Dr. Hanson's death. In making its factual findings the conversations between Ms. Husain and the flight attendant, the Court must rely primarily on the testimony of Ms. Husain. The Court finds Ms. Husain's testimony to be quite credible, and notes that her recollection of the events on Flight 417 was largely corroborated by the testimony of Dr. Sabharwal and her children, Isaac and Sarah Husain, as well as much of the uncontradicted evidence.

3. Defendant objects to Ms. Husain's testimony regarding this conversation, arguing that the statements attributed to Ms. Leptourgou are inadmissible hearsay. The Court permitted the testimony at trial, subject to later consideration of the hearsay question. After due consideration, the Court overrules defendant's objection. Ms. Leptourgou's statements were not offered for their truth, and

The Husains remained in their assigned seats during takeoff, and the first several minutes of the flight passed without incident. Shortly after takeoff, however, the captain turned off the "no smoking" signs, and passengers in the rows behind the Husains began to light cigarettes. From this point on, according to the testimony of Sarah Husain, passengers in rows 51 through 56 were smoking continuously. In addition to those seated in rows 51 through 56, a number of passengers from other rows stood temporarily in the aisles behind the Husains, smoking and socializing. As a result, smoke was both pervasive and constant.

As soon as the smoking began, the Husains were surrounded by ambient smoke which had floated forward into their row. When the smoke began to linger in row 48, Dr. Hanson gestured to his wife and complained that the smoke was "like a chimney." Ms. Husain then stood up and contacted Ms. Leptourgou for a third time. This time, Ms. Husain told the flight attendant, "You have to move my husband from here." Again, Ms. Leptourgou curtly refused, stating that the plane was full. Ms. Leptourgou indicated to Ms. Husain that Dr. Hanson could switch seats with another passenger, but that, in order to do so, Ms. Husain would have to walk through the cabin and ask other passengers herself. She could not enlist the assistance of the flight crew in changing her husband's seat. Ms. Husain, becoming more desperate and more adamant, told the flight attendant that her husband *had* to move, even if the only available seat were in the cockpit or the first class area of the cabin. The flight attendant, however, was equally

resolute. She offered no assistance. Finally, Ms. Husain seeing no hope for accommodation, returned to her seat.

Unbeknownst to the Husains, Flight 417 was actually not full. In fact, the flight contained eleven empty passenger seats.[4] The cabin had a capacity of 426 seats, 44 of which were located in business class and 382 of which were located in economy class. Four of these seats, located in a row immediately behind the smoking section, were designated as "crew rest" seats. Only 411 passengers traveled on Flight 417 on January 4. Therefore, the flight had eleven unoccupied seats, not including those designated for crew rest. Two of those empty seats were located in the business class section of the cabin.

In addition to the unoccupied seats, Flight 417 carried 28 "non-revenue passengers." Non-revenue passengers include employees and relatives of employees of Olympic Airways and other airlines. Of these 28 passengers, eleven were seated in the cabin's smoking sections. Of the remaining 17 non-revenue passengers, two were seated in rows one and two in business class and 15 were seated in rows 15 through 36 in economy class.

As the flight progressed, ambient smoke continued to circulate in the area of row 48. Approximately two hours into the flight, the crew served a meal. The evidence before the Court establishes that Dr. Hanson ordered a meal and that he ate some portion of it. He also shared some of his food with his daughter, Sarah, and with a woman seated to his right. According to Sarah, Dr. Hanson "wasn't really eating that much" of his meal.

---

are therefore not hearsay. *See* Fed.R.Evid. 801. Indeed, plaintiff charges, and the Court finds, that Ms. Leptourgou's statements were in fact untrue. The statements establish not that Flight 417 was full or that the crew was unable to move Dr. Hanson, but that Ms. Leptourgou failed to respond appropriately to Ms. Husain's concerns and entreaties. Moreover, even if the statements were admitted only for their truth, they would still likely be admissible as vicarious admissions of a party-opponent. *See* Fed.R.Evid. 801(d)(2).

4. There was some confusion at trial concerning the number of empty seats and how many of them were located in the non-smoking section of the plane. The Court's finding that there were eleven empty seats on the flight is supported by the flight's passenger manifest, the testimony of Captain Karayannis, and Olympic's admissions during discovery. Unfortunately, the evidence did not establish the precise location of these seats on the plane or how many of them were located in the non-smoking section.

Immediately after the meal service, smoking increased noticeably in the rows behind the Husains. Around this time, Dr. Hanson became unusually quiet. · At some point shortly after the meal, Dr. Hanson asked his wife for a new inhaler, indicating that the one he had been using had emptied. Ms. Husain retrieved a full inhaler from the overhead bin. Dr. Hanson turned around several times to look at the smoke in the rows behind him. He then told Sarah that the smoke was bothering his allergies, and decided to move toward the front of the cabin to breathe fresher air.

Sarah notified her mother of Dr. Hanson's discomfort, and Ms. Husain followed him to the front of the aircraft. Dr. Hanson walked forward a number of rows, stopping in the galley area between rows 19 and 20, well into the non-smoking area. When Ms. Husain reached him, he was leaning against a chair near the galley area. Dr. Hanson gestured to Ms. Husain to get the epinepherine that he carried in his emergency kit, which Ms. Husain had stored in a carry-on bag. Ms. Husain rushed to the rear of the plane to retrieve the epinepherine, then returned to the galley area and administered a shot to her husband in a pre-measured syringe.[5] She then ran to the rear of the cabin to wake Dr. Sabharwal.

Within seconds, Dr. Sabharwal, who, by chance, was an allergy specialist, arrived at the front of the plane to assist. Noticing that Dr. Hanson was in respiratory distress, Dr. Sabharwal pulled him onto the floor, gave him another shot of epi-

nepherine (.20 ccs), and began to administer CPR.[6] At this point, Dr. Hanson's pulse was barely palpable. Dr. Sabharwal noticed that, while Dr. Hanson's lower airways were obstructed, his upper airway was not. For this reason, he was able to push some air into Dr. Hanson's lungs during the administration of CPR. During the treatment, Dr. Sabharwal also gave Dr. Hanson a shot of Bricanyl, which had been retrieved from the Husains' emergency kit.

At some point during this period, Ms. Husain requested that one of the flight attendants provide an oxygen canister and mask for her husband. According to Ms. Husain's testimony, two flight attendants attempted to open the oxygen canister, but were unable to do so.[7] Ms. Husain summoned Sarah, who was walking toward the front of the aircraft, and asked her to retrieve Dr. Hanson's oxygen canister with its nasal canula from the family's emergency kit. Sarah relayed this message to her brother, Isaac, who brought the oxygen to Ms. Husain.

As they attempted to resuscitate Dr. Hanson, Dr. Sabharwal and Ms. Husain administered oxygen through a nasal canula. In addition, oxygen may have been administered through Olympic's canister with an attached mask. However, because Dr. Hanson was not able to breathe spontaneously, Dr. Sabharwal determined that the oxygen was not useful. About five minutes after Dr. Sabharwal arrived on the scene, the Olympic flight crew brought him a medical kit. By this point, however, Dr. Sabharwal believed that only a fully-

---

5. The parties agree that the epinepherine administered to Dr. Hanson on Flight 417 was fresh and had been properly maintained.

6. Although it is not entirely clear exactly how many shots of epinepherine Dr. Hanson received during the trauma that preceded his death, the testimony of Dr. Sabharwal, Ms. Husain, Isaac Husain and Sarah Husain confirm that at least two shots were administered, the first by Ms. Husain and the second by Dr. Sabharwal.

7. The testimony regarding oxygen administration was entirely contradictory. Rubina

and Isaac Husain both testified that the flight attendants were arranging an oxygen canister, but that they were unable to administer oxygen to Dr. Hanson. Ms. Husain, Dr. Sabharwal and Olympic flight attendant Eleni Xourgia all testified that Dr. Hanson was administered oxygen at some point during the incident with equipment obtained from the Husains' emergency kit. Theocharis Fotiades and Nikolaos Belkas testified that oxygen was supplied through Olympic's canister and mask.

equipped medical crash kit could save Dr. Hanson's life.

As time passed, a few other passengers arrived in the galley to assist Dr. Sabharwal, but no one was able to save Dr. Hanson. At approximately 4:40 p.m. Greenwich Mean Time, Dr. Sabharwal announced that Dr. Hanson had died.

During the entire incident, the airplane's captain never turned on the "no smoking" sign or otherwise requested that the passengers in the rear of the plane stop smoking.

### III. The Medical Causes of Dr. Hanson's Death

For religious reasons, no autopsy was performed on Dr. Hanson's body after his death, and the direct cause of his fatal attack is a matter of some dispute. Plaintiffs argue that Dr. Hanson's death was caused by a severe asthma attack brought on by inhalation of cigarette smoke. Defendant, on the other hand, argues that Dr. Hanson died as a result of anaphylaxis caused by an allergic reaction to food, or that he died as a result of some other unknown medical problem. As discussed below, the Court finds that plaintiff has established by a preponderance of the evidence that smoke ingestion during the first two hours of Flight 417 was a primary cause of Dr. Hanson's death.

Anaphylaxis is an allergic emergency which may be caused by an allergy to external material. Symptoms of anaphylaxis include skin discoloration, obstruction of the upper airway, disturbance in the intestinal tract, drop in blood pressure, shock or rapid, ineffective heartbeat. An asthmatic attack, on the other hand, is a reversible narrowing of the airway caused by air pollutants or other irritants, such as cigarette smoke.

The symptoms of asthma and anaphylaxis overlap significantly. Indeed, some severe asthma attacks may be characterized as anaphylactic reactions. In this case, the course of events with respect to the timing of the meal, Dr. Hanson's smoke inhalation, and the onset of his reaction support theories labeling the cause of death as both anaphylaxis and asthma. Both anaphylaxis and asthma attacks produce the same symptoms in the lower airway. Either can result in death. Epinepherine can be used to treat both anaphylaxis and asthma, but it is not necessarily efficacious in either case. The fact that Dr. Hanson received two or more injections of epinepherine during the flight and that the drug had no effect does not assist the Court in arriving at a cause of death.

Although anaphylaxis and asthma are sometimes difficult to differentiate, the Court finds that smoke played a significant causal role in Dr. Hanson's death. As both Dr. Golden and Dr. Wasserman acknowledged, cigarette smoke can act as an irritant. Moreover, the greater an individual's exposure to smoke, both in terms of time and intensity, the greater the irritant effect. As Dr. Golden explained in his testimony before the Court, the presence of an irritant can cause bronchospasm, constricting an individual's airways.

The Court finds significant the testimony of the Husain family and Dr. Sabharwal regarding Dr. Hanson's behavior in the Athens airport. During the hours-long delay in Athens, Dr. Hanson used his inhaler frequently and was increasingly bothered by the prevalent smoke. To escape the effects of the smoke, Dr. Hanson illicitly entered the first class lounge, where the air quality was slightly better. Dr. Hanson's problems in Athens indicate his sensitivity to smoke on the day in question.

Once the family was airborne toward New York on Flight 417, but prior to the in-flight meal service, Dr. Hanson again complained about the smoke. During the first hours of the flight, Dr. Hanson used his inhaler to remedy the effects of the smoky air while aboard the plane.[8] The

---

**8.** Although the Court heard no direct evidence that Dr. Hanson used his inhaler on the flight, the evidence shows that he was both-

ered by the smoke, and that he asked his wife for a new inhaler because the inhaler in his possession had become empty. In light of the

Court cannot credit defendant's suggestion that Dr. Hanson's breathing problems prior to the meal were causally unrelated to his later asphyxiation. The evidence before the Court suggests exactly the opposite conclusion. Dr. Hanson explicitly complained that smoke was affecting his breathing just hours before his death, complained to his wife about the level of cigarette smoke on the plane, and relied extensively on his inhaler for support during the hours leading to his fatal attack. To conclude, as defendant urges, that the smoke on Flight 417 did not trigger Dr. Hanson's death is to ignore the chain of events leading up to his attack.

Defendant introduced evidence at trial to establish that Dr. Hanson may have died as a result of an anaphylactic reaction to yeast, tomatoes or grapes in the in-flight meal. This contention is belied by several facts in the record. First, there is no evidence that Dr. Hanson ate any grapes, tomatoes or bread-based products on the flight. In fact, the only credible evidence regarding Dr. Hanson's food intake was the testimony of his daughter, Sarah. According to Sarah, Dr. Hanson received a meal on the flight, but did not eat the whole thing, and in fact shared it with both of his neighbors. No witnesses testified that they observed Dr. Hanson eating any of the foods to which he was allergic while seated in row 48. Without further evidence of Dr. Hanson's sensitivities and his food intake aboard the flight, the Court cannot conclude that his death was caused by a reaction to the food.

Further, Dr. Hanson's death lacked certain symptoms that frequently appear in cases of anaphylaxis. Anaphylaxis caused by oral injection of an allergen commonly causes swelling in the upper airway. In this case, Dr. Sabharwal observed that Dr. Hanson's upper airway was not obstructed. Anaphylaxis frequently, but not always, causes discoloration, redness and hives on a victim's chest and neck. Dr. Sabharwal

noticed none of those symptoms in this case.

Moreover, the testimony of Dr. Sabharwal, the only doctor who actually treated Dr. Hanson during his trauma, supports the Court's conclusion. While Dr. Sabharwal testified that he could not definitively diagnose the cause of Dr. Hanson's death, he did offer a differential diagnosis, assessing the likely causes of death in order of their probability. Dr. Sabharwal opined that, in light of Dr. Hanson's asthma and the obstruction of Dr. Hanson's airways, he most likely died as a result of status asthmaticus, or "totally uncontrolled asthma." The second most likely cause of death, according to Dr. Sabharwal, was anaphylaxis, and the third was "cardiac problems." Failing each of these potential causes, Dr. Sabharwal concluded that Dr. Hanson's death may have been precipitated by unknown causes.

Dr. Golden's testimony further supports the Court's factual findings regarding the cause of Dr. Hanson's death. Dr. Golden testified that, in the absence of food, the only possible cause of death in this case would be an asthmatic reaction. Because Dr. Hanson may have eaten some of his meal, Dr. Golden concluded that it is difficult to distinguish whether Dr. Hanson's condition was anaphylaxis or asthma. However, Dr. Golden was able to conclude that smoke was a significant contributing factor in Dr. Hanson's death, regardless of whether he ate a meal on Flight 417.

Dr. Wasserman, defendant's expert witness in this case, attributed Dr. Hanson's death to asphyxiation or heart failure brought on by a reaction to an allergen, possibly tomatoes or yeast. Even Dr. Wasserman acknowledged, however, that cigarette smoke may have contributed to Dr. Hanson's death, although he was unable to determine the extent of that contribution.

fact that Dr. Hanson frequently relied on his inhaler to remedy the adverse effects of am-

bient smoke, the Court finds that he used his inhaler while aboard Flight 417.

In conclusion, the Court finds that Dr. Hanson's death was the result of respiratory distress which was caused by an exacerbation of his asthmatic condition due to the prolonged and extensive exposure to second-hand smoke on Olympic's Flight 417.

**DISCUSSION**

*I. Applicable Law: The Warsaw Convention*

■ This case is governed by the provisions of the Warsaw Convention[9] ("the Convention"). The Convention is a comprehensive international treaty governing the liability of carriers in "all international transportation of persons, baggage or goods." 49 U.S.C. § 40105. The purposes of the Convention were to achieve uniformity and to limit the liability of air carriers. *See El Al Israel Airlines v. Tseng,* 525 U.S. 155, 119 S.Ct. 662, 671–72, 142 L.Ed.2d 576 (1999); *Carey v. United Airlines, Inc.,* 77 F.Supp.2d 1165, 1169 (D.Or. 1999). The parties agree that, because Dr. Hanson's death occurred during international travel, the Convention provides plaintiffs' exclusive remedy. *See Tseng,* 119 S.Ct. at 668. ("[R]ecovery for a personal injury suffered 'on board [an] aircraft or in the course of any of the operations of embarking or disembarking,' if not available under the Convention, is not available at all.").

■ The Convention provides for strict liability for carriers in certain situations, and precludes liability altogether in others. Article 17 of the Convention explains that a carrier "shall be liable" for death or bodily injuries of passengers sustained during flight as the result of an "accident." Articles 20 and 22 limit a carrier's liability under Article 17 to $75,000 per passenger. However, under Article 25, the $75,000 limitation does not apply if the carrier has committed "wilful misconduct."[10] *See gen-*

*erally Hermano v. United Airlines,* 1999 WL 1269187 (N.D.Cal. Dec. 21, 1999).

*II. The "Accident" Requirement*

Article 17 of the Convention provides that

The carrier shall be liable for damages sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft during the course of any of the operations of embarking and disembarking.

49 U.S.C. § 40105. The Supreme Court has interpreted this language to require the occurrence of an "accident" for a carrier to be held liable under the Convention. *See Air France v. Saks,* 470 U.S. 392, 396, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985).

In *Saks,* the Supreme Court defined "accident" as "an unexpected or unusual event or happening that is external to the passenger." *Saks,* 470 U.S. at 405, 105 S.Ct. 1338. The Court noted that "accident," as that term is used in the Convention, has a narrower definition than the term "occurrence." *Id.* at 398, 105 S.Ct. 1338. This inquiry is an objective one, and does not focus on the perspective of the person experiencing the injury. *See Gotz v. Delta Airlines, Inc.,* 12 F.Supp.2d 199, 201 (D.Mass.1998). Further, "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident." *Saks,* 470 U.S. at 406, 105 S.Ct. 1338. It is the cause of the injury, not merely the occurrence of the injury, that must qualify as an accident. *See id.* at 399, 105 S.Ct. 1338; *Gotz,* 12 F.Supp.2d at 201.

9. The Warsaw Convention is the popular name for the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), note following 49 U.S.C. § 40105.

10. This term is more commonly spelled today as "willful misconduct." For the purposes of this memorandum, the Court will use the modern spelling except for direct quotations.

Despite these limitations, the Court emphasized that its definition "should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id.* at 405, 105 S.Ct. 1338. Other courts have also concluded that the term "accident" should be "interpreted broadly." *See Carey,* 77 F.Supp.2d at 1170.

The Supreme Court has also explained that, while the "accident" must cause the passenger's injury, it need not be the *sole* causal factor. *Saks,* 470 U.S. at 405, 105 S.Ct. 1338. Rather, because "any injury is the product of a chain of causes," a plaintiff under the Convention need only "prove that some link in the chain was an unusual or unexpected event external to the passenger." *Id.* at 406, 105 S.Ct. 1338.

In this case, plaintiffs posit three specific occurrences aboard Flight 417 that might be construed as "accidents" contributing to Dr. Hanson's death: (1) Ms. Leptourgou's three refusals to move Dr. Hanson to another seat; (2) the flight crew's inability to provide a usable oxygen canister in a timely manner; and (3) and the captain's failure to turn on the "no smoking" sign during Dr. Hanson's attack. As discussed below, the Court concludes that only the first of these occurrences was an "accident" which caused Dr. Hanson's death.

### A. Refusal to Move Dr. Hanson

Plaintiffs first argue that Ms. Leptourgou's refusal to transfer Dr. Hanson to another row and her failure to follow company procedure was an "unusual" or "unexpected" event. The Court agrees.

██ The negligent failure of the flight crew to appropriately serve the needs of an ailing passenger can be considered an "accident" under the Convention. *See Fishman v. Delta Air Lines, Inc.,* 132 F.3d 138, 142 (2d Cir.1998) (flight attendant negligently spilled scalding water on passenger while attempting to attend to passenger's earache). A claim "does allege an accident if it arises from some inappropriate or unintended happenstance in the op-

eration of the aircraft or airline. Thus, an injury resulting from routine procedures in the operation of an aircraft or airline can be an 'accident' if those procedures or operations are carried out in an unreasonable manner." *Id.* at 143; *see also Schneider v. Swiss Air Transport Company Ltd.,* 686 F.Supp. 15 (D.Me.1988) (finding possible accident where flight attendant refused to assist passenger by asking other passengers sitting in front of her to raise their seats); *Langadinos v. American Airlines, Inc.,* 199 F.3d 68, 71 (1st Cir.1999) (finding possible accident where flight attendant imprudently served alcohol to a passenger whose behavior was already "erratic" and "aggressive"); *Carey,* 77 F.Supp.2d at 1171 (flight attendant's "acts of preventing plaintiff and his children from changing seats, engaging in heated, argumentative exchanges with plaintiff, informing him that he could be arrested if he did not stay in his seat and if his children did not stay in their seats, and publicly humiliating him meet the definition of 'accident' as articulated in *Saks*.").

Defendant argues that no unusual event occurred during the Husains' flight. According to defendant, ambient smoke is an expected and usual aspect of international flying. *See Warshaw v. Trans World Airlines, Inc.,* 442 F.Supp. 400 (E.D.Pa.1977) (routine repressurization of cabin was not an accident, even though it caused plaintiff to lose his hearing); *Saks,* 470 U.S. at 394, 105 S.Ct. 1338 (routine cabin pressurization during landing is not an accident); *Gotz,* 12 F.Supp.2d 199 (injury to passenger during attempt to stow baggage in overhead compartment was not accident, because crew "worked perfectly").

██ The Court does not dispute that smoke in the cabin may be an expected aspect of international travel. Indeed, it is clear from the record that the Husains knew before boarding that the January 4 flight would have a smoking section. However, defendant's argument misses the mark. The smoke in the cabin was not the "unusual" or "unexpected" event which

caused Dr. Hanson's death, although, as detailed above, the smoke undoubtedly had a significant place in the causal chain. Rather, the unusual and unexpected event on which plaintiffs base their claim was the failure of the flight attendant to adequately respond to Ms. Husain's transfer requests. Indeed, in both *Warshaw* and *Gotz,* in which the courts found that injuries not attributable to unusual aircraft operations were not actionable under the Convention, the courts specifically mentioned that the injured passengers had *failed to request assistance from the flight crew.* In this case, the opposite is true. With increasing urgency, Ms. Husain three times requested the crew's assistance prior to her husband's death, and her request was thrice denied.

Under no reasonable interpretation of the facts can one conclude that Ms. Leptourgou's failure to assist Dr. Hanson was expected or usual. The Court has heard extensive testimony on the standard of care for flight attendants in situations such as this, and concludes that Ms. Leptourgou acted in an unexpected and unusual manner in several respects.

First, the recognized standard of care for flight attendants during international air travel demands that a flight attendant make efforts to accommodate a passenger who indicates that he or she needs to be moved for medical reasons. In this case, despite Ms. Leptourgou's repeated statements that the flight was full, eleven seats stood unoccupied. The Court can conceive of no acceptable reason for Ms. Leptourgou's refusal to assist Dr. Hanson after Ms. Husain's second and third requests. Moreover, according to Diane Fairechild, a flight attendant with 21 years of experience in international travel, even if the flight had no empty seats in the economy section, the crew should have transferred Dr. Hanson to an empty seat in the business class section of the cabin. Notably, Ms. Husain's suggestion to this effect during her third plea for a seat change went unheeded by Ms. Leptourgou.

Ms. Xourgia, now a chief cabin attendant working for Olympic, testified that, if she were in Ms. Leptourgou's position at the time of Ms. Husain's third request (i.e., after takeoff, when smoking had commenced in row 51), she would have transferred Dr. Hanson "immediately." Ms. Fairechild, testified that, according to recognized industry standard of care, Ms. Leptourgou "should have absolutely responded" to Ms. Husain's requests.

Second, even if the flight were entirely full, the flight attendant should have attempted to move Dr. Hanson. Ms. Fairechild testified that, when faced with a medical request like Ms. Husain's during a full flight, the crew will often attempt to entice other passengers to switch their seats. In this case, a seat transfer would not have been difficult to effectuate, considering that 17 passengers seated in the cabin's non-smoking section were "non-revenue" passengers. The evidence reveals that such a transfer would be appropriate under the controlling standard of care. Even Theocharis Fotiades, the chief cabin attendant on Flight 417, explained that Ms. Leptourgou should "definitely" have attempted to find another seat for Dr. Hanson when Ms. Husain made her requests.

Third, not only did Ms. Leptourgou's failure to act violate the accepted industry standard of care, it also violated Olympic Airways' policy. As Mr. Fotiades testified at trial, Olympic crew members generally make efforts to move passengers who become ill during flights if moving those passengers will assist in their recovery. Mr. Fotiades explained that this policy applies when a passenger must be moved because of smoke-related illness. Further, according to Mr. Fotiades, Olympic flight attendants are familiar with this policy Ms. Leptourgou, however, entirely ignored it. Such behavior cannot be considered either expected or usual.

Fourth, even if Ms. Leptourgou did not personally assist Dr. Hanson to find a new seat, Olympic policy required that she, at least, alert the chief cabin attendant

("CCA") of Ms. Husain's medical requests. Ms. Xourgia testified that as a flight attendant in Ms. Leptourgou's position, she would have immediately contacted the CCA when Ms. Husain requested a seat change prior to takeoff. Although no written policy was placed into evidence by the parties, Ms. Xourgia testified that written Olympic policies require that when a passenger indicates that he needs to be moved for a medical reason, the flight attendant must report that request to the CCA.

In this case, Ms. Leptourgou did not contact the chief cabin attendant to alert him to Dr. Hanson's medical condition or Ms. Husain's requests. In fact, according to the evidence before the Court, Ms. Leptourgou did not contact any other members of the flight crew concerning Ms. Husain's three requests. Nor did she ask another member of the crew whether or not the flight was full. Mr. Fotiades, the chief cabin attendant, did not learn about Ms. Husain's requests for a seat change until after Dr. Hanson had died. Had he learned of the requests earlier in the flight, Mr. Fotiades testified that he would have made further inquiries and attempted to move Dr. Hanson to another seat.

Finally, because of Ms. Husain's precautionary actions in both the New York and the Cairo airports, Ms. Leptourgou's failure to assist Dr. Hanson is even more unexpected and unusual than in the typical case of a passenger transfer request. At the New York airport where the Husains first learned that Olympic permitted smoking on its flights, Ms. Husain informed the check-in agent that her husband was "susceptible to smoke" and could not "be in any smoke." As a result of this initial conversation, the Husains had reason to expect that Olympic was aware of Dr. Hanson's sensitivity to smoke. This expectation was further bolstered by Ms. Husain's conversation with the check-in agent at the Cairo airport prior to the family's return trip. After the Husains were given their tickets in Cairo, Ms. Husain returned to the counter to ensure that her husband had been given a seat in the non-smoking sections of the two return flights. At that time, Ms. Husain showed the agent a letter from Dr. Hanson's brother explaining that Dr. Hanson had a history of asthma. Again, one would expect that, as a result of this conversation, Olympic was aware of Dr. Hanson's medical needs. In light of this fact, Olympic's subsequent failure to move Dr. Hanson after three requests is even more unusual and unexpected.

Moreover, Dr. Hanson's expectation that Ms. Husain's requests would be accommodated was even more reasonable in light of the normal operating procedures of international carriers. Diane Fairechild testified that medical information and special requests like Ms. Husain's are normally inputted in a "special information log," which is given to the airplane's CCA prior to takeoff. The log serves to inform the CCA of the special needs of the passengers. In this case, despite Ms. Husain's warnings to Olympic check-in agents regarding her husband's condition, nothing to that effect appeared in Olympic's special information log. A passenger in Dr. Hanson's position should expect that medical needs expressed to an agent prior to check-in will be considered once the flight has been boarded. In Dr. Hanson's case, that reasonable expectation was not met.

In sum, Ms. Leptourgou's behavior was far from usual or expected. She violated the industry standard of care, she misrepresented to Ms. Husain that the flight was full, and she acted in contravention of accepted Olympic Airways policy. This aberrant behavior was both unexpected and unusual.

In the face of this evidence, defendant analogizes to a number of published cases in which the Convention's "accident" requirement was narrowly applied. For instance, defendant relies on *Margrave v. British Airways*, 643 F.Supp. 510 (S.D.N.Y.1986), in which the district court noted that sitting in "a very cramped position" during a flight delay is neither unusual nor unexpected. The plaintiff in *Margrave* sat in her seat for approxi-

mately five hours while her plane waited for takeoff. Because "normal travel procedures" were followed by the crew, the court concluded that no "accident" had occurred. *Id.* at 512. Defendant argues that, under *Margrave,* sitting in an assigned seat cannot be considered an "accident," even if remaining seated causes injury to the passenger. However, *Margrave* is distinguishable from the instant case. In *Margrave,* the plaintiff never told a flight attendant about her discomfort. *Id.* at 511. In contrast, here the unusual event was not Dr. Hanson's seat location, but the flight attendant's refusal to accommodate his needs despite three requests.

Defendant also cites a number of cases in which the crew's failure to assist an ailing passenger was held to not constitute an "accident." For instance, in *Krys v. Lufthansa German Airlines,* 119 F.3d 1515 (11th Cir.1997), the Eleventh Circuit held that an airplane crew's negligent decision to continue a flight to its scheduled destination despite a passenger's in-flight heart attack was not an actionable "accident" under Article 17. *See also McDowell v. Continental Airlines,* 54 F.Supp.2d 1313, 1320 (S.D.Fla.1999) (reluctantly following *Krys* ); *Fischer v. Northwest Airlines, Inc.,* 623 F.Supp. 1064, 1065 (N.D.Ill. 1985) (refusal to aid passenger with heart attack was not "accident"). *But see Seguritan v. Northwest Airlines, Inc.,* 86 A.D.2d 658, 446 N.Y.S.2d 397, 398–99 (N.Y.App. Div.1982) ("The 'accident' is not the heart attack suffered by the decedent. Rather, it is the alleged aggravation of decedent's condition by the negligent failure of defendant's employees to render her medical assistance.").

The seminal case in this line of "failure to assist" decisions is *Abramson v. Japan Airlines Co., Ltd.,* 739 F.2d 130 (3d Cir. 1984). In *Abramson,* the plaintiff was suffering from a preexisting paraesophagael hiatal hernia when he boarded the flight. The plaintiff's condition worsened during the flight, and he asked the flight attendant if he could lie down in empty seats so that he could apply a useful "self help"

remedy which included massaging his stomach and occasionally inducing vomiting. *Id.* at 131. The court found that no accident had occurred because the aggravation of the passenger's injury was not an unusual or unexpected occurrence. *Id.* at 132. The court noted that "[i]n the absence of proof of abnormal external factors, aggravation of a pre-existing injury during the course of a routine and normal flight should not be considered an 'accident' within the meaning of Article 17." *Id.* at 133.

Each of these cases, including *Abramson,* is distinguishable from the one at bar. Unlike Dr. Hanson, the passengers in each of the cited cases suffered an injury as a result of entirely "internal" forces. While the inaction of the crew may have aggravated the passengers' injuries, it did not precipitate the injuries as such. Here, on the other hand, the flight attendant's failure to transfer Dr. Hanson—or her failure to at least follow the proper procedures— *precipitated* Dr. Hanson's injury and death. *See Fishman,* 132 F.3d at 141–142 (distinguishing *Abramson* and *Fischer* on similar grounds).

Additionally, none of the cases cited by defendant arose from a crew member's blatant disregard of industry standards and airline policies. As described above, the testimony in this case indicates that Ms. Leptourgou's actions were anything but usual. When a passenger boards an airplane, he or she should be able to expect that the flight crew will comply with accepted procedures and rules. A failure to do so is unexpected.

Finally, to the extent that any of defendant's cited cases are not distinguishable from the instant case, the Court finds that they are both unconvincing and non-binding in this Circuit. The Court finds little merit in the notion that a flight crew has no legal obligation to care for its ill or endangered passengers. The practical effect of cases like *Abramson* is to dissolve the airlines' duty of care and to "create[ ] an incentive to airlines engaged in interna-

tional travel not only not to exercise the highest degree of care but to completely refuse to treat" or assist passengers with medical problems. *McDowell,* 54 F.Supp.2d at 1320. In the absence of binding authority, the Court declines to adopt such a rule.[11]

The Court concludes that when a flight attendant's acts create a foreseeable risk of injury to passengers, an "accident" has occurred. *See Langadinos,* 199 F.3d at 71. In this case, Ms. Leptourgou's failure to respond appropriately to Ms. Husain's requests and her failure to comply with the applicable standards of care were both "unexpected" and "unusual." *See Tsevas v. Delta Air Lines, Inc.,* 1997 WL 767278 (N.D.Ill. Dec. 1, 1997) (flight attendant's failure to move passenger upon request in order to keep her away from a second passenger's lewd behavior was an "accident" under Article 17). Therefore, Ms. Leptourgou's behavior is actionable under the Warsaw Convention.

Having concluded that Ms. Leptourgou's failure or refusal to assist Dr. Hanson constituted an "accident," the Court must next consider whether that "accident" caused Dr. Hanson's death. As discussed above, the coincidental occurrence of both an accident and an injury aboard an international flight does not necessarily support a cause of action under the Convention. To prevail, plaintiffs' must establish that the accident *caused* the injury. *Gotz,* 12 F.Supp.2d at 201. In *Saks,* the Supreme Court recognized that "any injury is the product of a chain of causes." *Saks,* 470 U.S. at 406, 105 S.Ct. 1338. To establish liability, a plaintiff need only "prove that some link in the chain was an unusual or unexpected event external to passenger." *Id.* Courts have traditionally applied regular proximate cause analysis to determine

carrier liability under the Convention. *See Margrave,* 643 F.Supp. at 512.

■ In light of this standard, the Court finds that Olympic's failure to move Dr. Hanson caused Dr. Hanson's death. As discussed above, Dr. Hanson's death was caused, at least in significant part, by smoke inhalation which triggered a severe asthmatic reaction. Dr. Hanson was seated in row 48, only three rows in front of the designated smoking section. Four witnesses at this trial were seated in Dr. Hanson's vicinity on Flight 417, and all four noted that the ambient smoke was noticeably thick in row 48. At several points in the flight, Dr. Hanson indicated his discomfort with the seating arrangement. As noted above, Ms. Leptourgou or another member of the Olympic crew could have moved Dr. Hanson to any of the eleven empty seats on the plane or to one of the 17 non-smoking seats occupied by non-revenue passengers. If Ms. Leptourgou had moved Dr. Hanson out of the vicinity of the smoking section, he would not have died aboard Flight 417. Therefore, the Court must conclude that Dr. Hanson's death was caused by an accident, triggering liability under the Warsaw Convention.

### B. Administration of Oxygen

■ In addition to Ms. Leptourgou's failure to move Dr. Hanson to another seat, plaintiffs argue that two other "accidents" occurred aboard Flight 417 which caused Dr. Hanson's death. First, plaintiffs assert that defendant's failure to effectively administer oxygen to Dr. Hanson through a face mask should be considered an "accident" under the Convention. According to plaintiffs, Dr. Hanson may not have died if the flight crew had properly

---

**11.** Additionally, the Court cannot turn a blind eye on the sudden sea change in interpretation of the Convention that has occurred in the wake of the Supreme Court's recent decision in *Tseng, supra.* In reaching its conclusions of law in this case, the Court agrees with the *McDowell* court that cases such as

*Abramson* and *Krys* create "absurd results" in the wake of *Tseng. McDowell,* 54 F.Supp.2d at 1319. Viewed in the proper context, the holdings of these pre-*Tseng* cases are less than compelling. *See generally McDowell,* 54 F.Supp.2d at 1319 (discussing the effect of *Tseng* on Warsaw Convention jurisprudence).

prepared and supplied oxygen during Dr. Hanson's fatal attack.

To resolve this question, the Court must engage in a three-step inquiry. First, the Court must decide whether, as a purely legal matter, the failure to properly administer oxygen can be considered an accident. Second, the Court must decide as a factual matter whether the acts of the flight crew in this case constituted an unexpected or unusual event. If so, the Court must finally determine whether the flight crew's acts caused Dr. Hanson's death.

Turning first to the legal issue, the Court is aware of two published cases which address the question of whether an airline may be held liable under the Convention for the failure to properly administer oxygen. In *Tandon v. United Air Lines,* 926 F.Supp. 366 (S.D.N.Y.1996), the plaintiff suffered a heart attack during an international flight. When a doctor attempted to administer oxygen from the airplane's on-board canister, he discovered that the canister had expired two month's earlier, and that it contained insufficient oxygen supply. *Id.* at 368. The plaintiff did not receive proper care, and died aboard the flight. The district court found that, because no unusual or unexpected event external to the plaintiff had *triggered* the plaintiff's heart attack, the later failure of the defendant to save her did not constitute an accident. *Id.* at 369.

The Court declines to follow the rule enunciated in *Tandon.* The Court cannot agree with the *Tandon* court that an expired oxygen container or a negligently maintained medical kit can somehow be considered an "expected" or "usual" aspect of international flight. Rather, the Court adopts the reasoning of the district court in *McDowell v. Continental Airlines,* 54 F.Supp.2d 1313 (S.D.Fla.1999). In *McDowell,* the court noted that improper maintenance of a carrier's on-board medical equipment can be considered an "accident." 54 F.Supp.2d at 1318. In determining whether an accident had occurred, the court considered the carrier's level of care in maintaining the medical kit and the carrier's compliance or noncompliance with federal regulations and industry standards. *Id.* at 1318. Although the court in *McDowell* concluded that the plaintiff had failed to establish facts showing negligent maintenance of the on-board medical kit, the court's discussion is instructive. Therefore, the Court holds that the failure to properly maintain or administer oxygen to an ailing passenger aboard an international flight may . be considered an accident.

The Court must next apply this legal conclusion to the facts of this case. As described above, the testimony on this subject is contradictory at best. Both Dr. Sabharwal and Ms. Husain testified that the Olympic crew members were unable to provide bottled oxygen with an attached mask, while members of the crew testified that they did, in fact, provide an oxygen mask and canister, and that the apparatus functioned properly. Mr. Fotiades was particularly adamant in his testimony that he observed Dr. Hanson breathing oxygen through an Olympic-supplied mask at some point during the incident.

In light of this conflicting testimony, the Court finds that the evidence on the question of the oxygen administration is inconclusive. While the flight crew may have had some trouble preparing the oxygen when first asked by Ms. Husain, it is far from clear that the Olympic oxygen canister and mask were not used on Dr. Hanson or that the delay during the flight crew's troubles lasted more than a few moments. The Court notes that the time period between Ms. Husain's first request for oxygen and Dr. Hanson's death was approximately ten minutes. During a significant portion of that time, Dr. Sabharwal and Ms. Husain were administering CPR, making the availability of oxygen irrelevant. In the flurry of intense activity that preceded Dr. Hanson's death, it is possible that both Ms. Husain and Dr. Sabharwal failed to notice that Olympic's oxygen tank was in use.

Additionally, even if the flight crew did have some trouble preparing the oxygen canister, the Court cannot find that an accident necessarily occurred. In the heat of the moment, a certain amount of fumbling is normal and expected, even by experienced flight attendants. Plaintiffs have not established that the flight crew's problems providing an oxygen canister lasted for a significant period of time.

In sum, the Court finds that plaintiffs have failed to meet their burden of establishing that the flight crew's behavior in preparing the oxygen was unusual or unexpected. . Therefore, the Court concludes that the flight crew's acts during Dr. Hanson's fatal attack did not constitute an accident.

Further, even if the acts of the flight crew could be described as an "accident," the Court finds as a matter of fact that any failure to properly administer oxygen did not cause Dr. Hanson's death. Even if the flight crew did commit an error, the Court cannot conclude that this error provided a link in the causal chain that resulted in Dr. Hanson's death. *See Saks,* 470 U.S. at 406, 105 S.Ct. 1338. In reaching this conclusion, the Court is cognizant of the testimony of Dr. Zarir G. Marawala, who explained that a nasal canula is typically less effective than a mask when a patient is experiencing respiratory distress. According to Dr. Marawala, a person in such a condition is more likely to attempt to breathe through his mouth.

While this may be true as a general proposition, the Court finds that the use of a mask would not have been useful in this case. By the time Ms. Husain and the Olympic crew attempted to administer oxygen to Dr. Hanson, his condition had progressed beyond salvation. According to the testimony of Dr. Wasserman, the administration of oxygen by way of a mask or a nasal canula is generally useless when a patient is experiencing airway obstruction. After reviewing the entire record, Dr. Wasserman concluded that any error in the administration of oxygen and CPR to Dr. Hanson did not cause his death.

Rather, by the time Dr. Hanson was seated in row 19, properly-administered oxygen, even through a mask, would not have prevented Dr. Hanson's death. Dr. Golden's testimony also supports this conclusion. According to Dr. Golden, when a patient's airways are constricted, an oxygen mask is no more effective than a nasal canula.

On the basis of this testimony, the Court concludes that, even if the flight crew's delay in providing oxygen to Dr. Hanson constituted an "accident" under the terms of the Convention, that "accident" did not cause Dr. Hanson's death.

### C. Failure to Ignite "No Smoking" Sign

■ Plaintiffs also argue that a separate "accident" occurred when the flight crew failed to request that the smoking passengers extinguish their cigarettes. Plaintiffs argue that the captain should have ignited the sign to ensure that no passengers would smoke in the vicinity of Dr. Hanson during his attack. According to plaintiffs, the failure of the captain and the flight crew to request that other passengers stop smoking while Dr. Hanson received oxygen constituted an "unusual" or "unexpected" event.

The Court rejects this argument for three reasons. First, according to the testimony of Olympic Airways captain Demetrios Karayannis, it is not standard procedure to ignite the "no smoking" whenever a passenger is experiencing medical problems. Viewed in light of this testimony regarding the standard of care, the Court cannot credit plaintiffs' argument.

Second, the Court finds nothing in the record to suggest that any passengers were smoking in the vicinity of Dr. Hanson while he received oxygen. Indeed, the smoking section of the airplane began in row 51, but, by the time the crew was aware of Dr. Hanson's distress, he was seated 31 rows away in row 19. Therefore, the flight crew's failure to turn on the

"no smoking" sign did not constitute an unexpected or unusual event.

Finally, as discussed above, by the time the administration of Dr. Hanson's oxygen began, his condition had already become irreversibly fatal. Whatever minimal level of ambient smoke may have reached row 19 during the incident, it certainly had no effect on Dr. Hanson's treatment, and did not cause his death.

### III. Willful Misconduct

■ As discussed in section IIA above, Ms. Leptourgou's failure to move Dr. Hanson to another seat was an "accident," creating liability under the Warsaw Convention. Carrier liability under the Convention is normally limited to $75,000 per passenger. However, that limitation on damages does not apply if the defendant airline committed willful misconduct in causing the accident. *See Koirala v. Thai Airways Int'l,* 126 F.3d 1205, 1209 (9th Cir.1997). Article 25, the Convention's "willful misconduct" provision, does not create a distinct cause of action separate from Article 17, the Convention's "accident" provision. *See McDowell,* 54 F.Supp.2d at 1320. Rather, Article 25 simply modifies the potential recovery of a passenger who has established the occurrence of both an "accident" and "willful misconduct." *Id.* In other words, if no "accident" occurred on the flight, the Court cannot find that defendant is separately liable for the "willful misconduct" of the crew. In this case, because the Court has concluded that an "accident" caused Dr. Hanson's death, the Court must next determine whether the behavior of the flight crew constituted "willful misconduct."

The Ninth Circuit has defined "willful misconduct" as "the intentional performance of an act with knowledge that the ... act will probably result in injury or damage or the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences." *Koirala,* 126 F.3d at 1209. *See also Hermano,* 1999 WL 1269187 at *5 (citing *Piamba Cortes v. American Air-*

*lines, Inc.,* 177 F.3d 1272, 1290 (11th Cir. 1999)) (to establish willful misconduct, plaintiff must show that defendant acted with "intent to cause damage" or " 'recklessly and with knowledge' that damage would probably result."). In a case published earlier this year, the Fourth Circuit considered whether "willful misconduct" requires subjective or objective recklessness. *See Bayer Corp. v. British Airways, PLC,* 210 F.3d 236 (4th Cir.2000). The court concluded that the former standard was more appropriate, noting that "[o]n a mens rea spectrum from negligence to intent, article 25's standard is very close to the intent end." *Id.* at 238. Rather than establishing that the actor "should have known" of an obvious risk, the plaintiff in a case brought under the Warsaw Convention must, at a minimum, prove that the actor "must have known" of the risk in order to establish willful misconduct. *Id.* at 239 (quoting *Piamba,* 177 F.3d at 1291). The plaintiff bears a "heavy burden" in proving willful misconduct. *Id.; see also Saba v. Compagnie Nationale Air France,* 78 F.3d 664, 668 (D.C.Cir.1996) (requiring plaintiff to show actor's subjective state of mind in order to prove "willful misconduct"); *Piamba Cortes,* 177 F.3d at 1291. Although the Ninth Circuit has not explicitly decided whether Article 25 requires an element of subjective knowledge, the *Koirala* court held that "conscious and reckless disregard" of the crew's duties constituted willful misconduct under the Convention. *Koirala,* 126 F.3d at 1212. For the purposes of this decision, the Court will assume that the Article 25 requires a finding of subjective recklessness.

The Court must note, however, that Ms. Leptourgou's subjective state of mind "may be established solely by inferences taken from circumstantial evidence; the inferences thus act as 'a legitimate substitution for intent to do the proscribed act because, if shown, it is a proxy for that forbidden intent.' " *Piamba Cortes,* 177 F.3d at 1286 (quoting *Saba,* 78 F.3d at 668). In fact, it is possible to infer subjective recklessness based on "the very fact

that the risk was obvious." *Id.* at 1291 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

In this case, the Court finds that the flight attendant's failure to move Dr. Hanson or to report Ms. Husain's request to the CCA was "willful misconduct." The Court concludes that, at the time of her third refusal to assist Dr. Hanson, Ms. Leptourgou *must have known* that the cabin was not full, that Dr. Hanson had a medical problem and a special susceptibility to smoke, and that her failure to move him would aggravate his condition and cause him probable injury. The Court reaches this conclusion only after a careful examination of the testimony and the circumstances of Ms. Leptourgou's repeated refusals to help the Husains.

A number of considerations support the Court's conclusion. First, the Court finds that, at the time of the accident, Ms. Leptourgou was aware of the industry standard of care described in section II, *supra.* Mr. Fotiades testified at trial that the flight attendants working under his supervision were aware of the appropriate responses to seat transfer requests. Second, the Court finds that Ms. Leptourgou was aware of Olympic's specific policy requiring that a flight attendant inform the CCA when a passenger requests a seat transfer for medical reasons. Ms. Xourgia testified that Olympic flight attendants receive formal training on this policy. Third, the Court finds that Ms. Leptourgou must have known that Flight 417 was not "totally full," as she informed Ms. Husain. The evidence shows that Ms. Leptourgou passed through the cabin prior to takeoff to ensure that all passengers were seated. During this walk-through, Ms. Leptourgou must have seen several empty seats. In the face of this inference, defendant has submitted no evidence whatsoever to suggest that Ms. Leptourgou did not know or might not have known that the plane contained empty seats.

From this understanding, the Court next turns to the crucial testimony of Ms. Husain. Because Ms. Leptourgou was not available to testify in this trial, Ms. Husain's memory of her conversations with the flight attendant are entirely uncontested. The Court finds Ms. Husain's testimony on this topic highly credible.

The testimony of Ms. Husain makes one thing clear: Ms. Husain was not merely a typical passenger complaining about an inconvenient seat assignment. Ms. Husain made three requests to be moved. Nothing in the record indicates that any other passenger requested any such assistance more than once. Additionally, each of Ms. Husain's requests was more emphatic and desperate than the last. Once the passengers seated behind Dr. Hanson had begun to smoke, Ms. Husain's pleas reached a level of unmistakable urgency and seriousness. According to her testimony, Ms. Husain literally *begged* Ms. Leptourgou to move her husband. She told the flight attendant, "I don't care if the plane is full. Sit him on the carpet, sit him in first class, but don't sit him here." The Court finds that Ms. Husain communicated her husband's problem to the flight attendant so emphatically that Ms. Leptourgou must have recognized the danger. Further, Ms. Husain indicated to Ms. Leptourgou several times that she wanted only her husband moved, not the rest of the family. The fact that Ms. Husain was willing to sit apart from her husband during the entire ten-hour flight should have indicated to the flight attendant that the situation was serious enough to merit further consideration. After hearing the testimony of Ms. Husain, the Court concludes that Ms. Leptourgou cannot have failed to recognize that Dr. Hanson's problem was a medical one and that sitting near the smoking section was likely to cause him injury.

Moreover, the evidence suggests that Ms. Leptourgou *did* in fact recognize the seriousness of Ms. Husain's request, even though she failed to respond appropriately. The fact that Ms. Leptourgou gave Ms. Husain permission to act on her own to find another seat indicates that she un-

derstood the seriousness of Ms. Husain's entreaties. Clearly, Ms. Leptourgou understood that Dr. Hanson's problem was serious enough to merit a seat transfer of some type. Her subsequent failure to assist Ms. Husain or to follow standard procedures by contacting the CCA is inexplicable. The Court can only conclude that by refusing to perform her duties, Ms. Leptourgou deliberately closed her eyes to the probable consequences of her acts. This was willful misconduct.

Defendant has suggested that, because Ms. Leptourgou could not have known that Dr. Hanson would die as a result of his allergy, she could not have recognized the risks inherent in her actions. While the Court agrees that Ms. Leptourgou did not know that Dr. Hanson would die if not moved, this fact alone does not preclude a finding of willful misconduct. Plaintiffs must show only that Ms. Leptourgou was aware that her refusal to assist Dr. Husain was likely to cause an injury to him; they need not establish that Ms. Leptourgou was aware of the exact injury that her act was likely to cause. *See Saba*, 78 F.3d at 668. In other words, Ms. Leptourgou need not have known, and in all likelihood did not know, that Dr. Hanson might die as a result of her refusal to assist him. However, for the reasons discussed above, she did know—she *must have known*—that her acts in violation of recognized policy were likely to cause him injury.

Defendant has also suggested that Ms. Husain should have been even more explicit than she was in making her pleas to Ms. Leptourgou. No doubt she could have used precise medical terms rather than stating that her husband was "allergic" to smoke. Arguably, she could have explained that her husband had suffered two serious medical incidents in the previous year that required the assistance of the paramedics. Perhaps these more explicit explanations would have propelled the flight attendant to take the appropriate action. However, the Court rejects this argument for two reasons. First, as explained above, Ms. Husain's pleas, while factually bare, were sufficiently straight-forward to alert Ms. Leptourgou of the impending danger and the need to move Dr. Hanson to another seat. Ms. Husain's use of the term "allergic to smoke" notified Ms. Leptourgou that Dr. Hanson's problems were medical in nature, even though her words may have been medically imprecise. Further, the emotional urgency of Ms. Husain's requests, which was conveyed in her testimony before this Court, informed Ms. Leptourgou of the potential seriousness of Dr. Hanson's medical problems. Although Ms. Husain did not use the word "asthma" or describe the incident in Las Vegas, Ms. Leptourgou must have known the gravity of Dr. Hanson's condition.

Second, the Court declines to place the unreasonable burden on airplane passengers to provide a detailed explanation of their medical history in order to receive the mandatory and expected acceptable level of service. When aboard a commercial airplane, passengers can be anxious and inarticulate. Airline regulations, both written and unwritten, recognize that passengers are not always able to completely articulate their needs. For this very reason, airlines create policies and procedures, such as Olympic Airways' requirement that a flight attendant must inform the chief cabin attendant upon learning of a passenger's medical needs. At a minimum, compliance with such procedures leads to a more accurate exchange of information between the passenger and the crew. Ms. Leptourgou knew that Dr. Hanson had a susceptibility to smoke, knew that his wife feared serious injuries if he remained in row 48, knew that the flight was not entirely full, and knew that Olympic regulations required her to contact the CCA and/or to make an effort to move Dr. Hanson. In spite of all this knowledge, she did nothing.

Ms. Fairechild, a 21-year veteran of commercial airline service, testified to the egregiousness of Ms. Leptourgou's behavior, noting that she was "shocked" by Ms. Leptourgou's failure to act and labeling it

"criminal." After reviewing the record, Ms. Fairechild testified that "I've never seen anybody treated like this on an international flight, so it's not—it's not airline service as far as I experienced or I would expect." In light of all this evidence, the Court must conclude that Ms. Leptourgou's behavior constituted willful misconduct, as that term has been interpreted under the Warsaw Convention. *See Koirala*, 126 F.3d at 1211 (finding inference of willful misconduct based on expert testimony that "the flight crew's actions in this case were 'completely substandard of any scheduled airlines in the world.' ").

### IV. Comparative Negligence

The Court must next turn to the difficult question of comparative negligence. While the Warsaw Convention creates a strict liability standard for injuries caused by accidents during international travel, that liability is not absolute. Article 21 of the Convention provides:

> If the carrier proves that the damage was caused by or contributed to by the negligence of the injured person the court may, in accordance with the provisions of its own law, exonerate the carrier wholly or partly from his liability.

Both parties agree that the Court should apply California's comparative negligence standard in this case rather than a traditional contributory negligence standard. *Accord Eichler v. Lufthansa German Airlines*, 794 F.Supp. 127, 130 (S.D.N.Y.1992) (applying federal common law comparative negligence standard); *Bradfield v. Transworld Airlines, Inc.*, 88 Cal.App.3d 681, 685, 152 Cal.Rptr. 172 (1979) (applying state law comparative negligence standard).

A recent unpublished district court opinion from New York perhaps best describes the Convention's rule regarding comparative negligence. *See Eichler v. Lufthansa German Airlines*, 1994 WL 30464 (S.D.N.Y. Jan. 28, 1994). The *Eichler* court noted the apparent incongruity of the Convention's no-fault standard of liability under Article 17 and its consideration of contributory negligence under Ar-

ticle 21. Analogizing to the arena of strict products liability, the court concluded that Article 21's standard is best described as a "comparative causation" standard rather than a "comparative fault" standard. In other words, although the predicate for triggering Article 21 is negligence, "the basis for apportioning liability is the *comparative responsibility or causation* of the parties." *Id.* at *5 (emphasis added). The Court adopts this well-reasoned interpretation of the Convention.

Accordingly, the Court must consider two questions. First, the Court must determine whether Dr. Hanson acted negligently during Flight 417. If the Court answers that question in the affirmative, it must next consider the comparative causation of Ms. Leptourgou's refusal to assist Dr. Hanson and Dr. Hanson's own negligent failure to act.

### A. Dr. Hanson's Negligence

Defendant suggests that Dr. Hanson was negligent in two ways. First, defendant contends that Dr. Hanson's failure to request to speak with Ms. Leptourgou's supervisor was unreasonable. Second, defendant asserts that Dr. Hanson's failure to make any attempt to find another passenger who was willing to switch seats with him was also negligent. The Court will address these two arguments in turn.

#### 1. Failure to Seek Assistance of Supervisor

First, defendant suggests that Dr. Hanson and Ms. Husain should not have merely accepted Ms. Leptourgou's refusal to move Dr. Hanson. Rather, they should have requested to speak with Ms. Leptourgou's supervisor. The Court disagrees. Imposing such a duty would place an unreasonable burden on a passenger, penalizing her for obeying the instructions of a flight attendant. Moreover, it is not realistic to expect Ms. Husain to understand the flight crew hierarchy aboard commercial aircraft. Indeed, as Ms. Husain testi-

fied at trial, she did not know at the time of the incident that Ms. Leptourgou even had a supervisor. A reasonable passenger in Ms. Husain's position would have reached precisely the conclusion that Ms. Husain herself reached after listening to the flight attendant's final rebuff: her husband could either remain in his assigned seat or take it upon himself to exchange seats with another passenger. The Court cannot fault either Dr. Hanson or Ms. Husain for failing to realize that the aircraft also carried a CCA to supervise the flight attendants.

### 2. Failure to Attempt to Move Independently

Defendant's second argument is far more persuasive. The Court finds that Dr. Hanson was negligent in failing to attempt to transfer his seat after Ms. Husain's third interaction with Ms. Leptourgou. As described above, after Ms. Husain's third request to move her husband, the flight attendant responded that the plane was full and that she could not move Dr. Hanson. She then told Ms. Husain, "You have to go ask people yourself."

Without question, Ms. Leptourgou's instruction to Ms. Husain was inappropriate in light of Olympic's policies. However, once the flight attendant granted Dr. Hanson and Ms. Husain permission to find a seat on their own, that option was available to them. Dr. Hanson, after apparently weighing the potential risk to himself against the inconvenience, discomfort and probability of success of personally requesting a seat transfer from other passengers, chose not to act. The Court finds that this decision was unreasonable under the circumstances.

Dr. Hanson was in a unique position to understand precisely how serious his condition was. He knew his medical history. He was aware of his near-fatal attack in Las Vegas and his breathing troubles in Alameda. As a doctor, he probably understood his condition and the risks associated with it. He alone knew exactly how the ambient smoke was affecting his body during the hours leading up to his death. In other words, like Ms. Leptourgou, Dr. Hanson must have known that he would probably be injured if he remained in row 48. Ms. Leptourgou presented him with an option to escape the potential injury that inhaling the smoke-filled air would cause: he could walk toward the front of the cabin and approach other passengers to ask them to switch seats with him. In light of what Dr. Hanson knew and what he should have known, the Court concludes that he should have accepted Ms. Leptourgou's option, as unappealing as it may have appeared. The failure to do so constituted negligence.

### B. Comparative Causation

██ While Dr. Hanson's failure to act was negligent, that negligence does not necessarily eradicate the effects of Ms. Leptourgou's wrongdoing. Dr. Hanson does not bear the full responsibility for the events that transpired after the meal service. *Either* Dr. Hanson *or* Ms. Leptourgou could have taken action to move Dr. Hanson to the front of the plane. Both should have taken such action. Neither can point to the other as being solely responsible for Dr. Hanson's death. The Court must therefore determine how each actor's wrongful or negligent decisions contributed to the tragedy that followed.

At first glance, it may appear that Dr. Hanson's failure to act played the larger role in causing his death. As discussed above, he had intimate knowledge of both the extent of his sensitivity to smoke and the effect of the ambient smoke on his ability to function during the flight. Further, it was Dr. Hanson who made the ultimate decision not to attempt to move. Viewing the facts from this perspective, whatever Ms. Leptourgou's culpability, Dr. Hanson should bear the greater responsibility for causing his own death.

After careful consideration of the evidence, the Court concludes that this "first glance" position is incorrect for two reasons. First, while Dr. Hanson should have attempted to switch seats with another

passenger, there is no guarantee at all that his actions would have resulted in his finding a new seat farther from the smoking section. Nothing in the record indicates that other passengers would have been willing (or are typically willing) to switch seats at the request of a fellow passenger with an assigned seat in close proximity to the airplane's smoking section. Further, it is far from clear that Dr. Hanson would have discovered the availability of the eleven unoccupied seats during his proposed sojourn to the front of the cabin. The evidence before the Court establishes that, to the average observer, the plane appeared to be full. The open seats were likely scattered throughout the cabin, and were difficult to see with an unfamiliar eye. Dr. Hanson may not have discovered an empty seat or found another passenger willing to swap seats.

On the other hand, if Ms. Leptourgou had acted properly, it is highly unlikely that Dr. Hanson would have remained in row 48. It is far more likely that, had Ms. Leptourgou followed the appropriate procedures, the CCA would have been able to move Dr. Hanson into one of the empty non-smoking seats. Further, the CCA also had unique knowledge as to which passengers were "non-revenue" passengers who could be easily asked to move. Therefore, in terms of likely outcomes, Ms. Leptourgou's failure to act was of greater consequence than Dr. Hanson's.

Second, although Ms. Leptourgou gave Dr. Hanson and Ms. Husain her permission to search for another seat, the fact remains that the flight attendant was in a far better position to effectuate a change. Ms. Leptourgou had knowledge of the flight crew hierarchy and had access to the CCA and his additional knowledge and influence. She also had the ability to find Dr. Hanson an open seat without any significant effort. Further, as a trained flight attendant, she had both experience and expertise in making requests such as the one she suggested that Ms. Husain make on her own. None of this can be said for Dr. Hanson himself. In other words, Ms. Leptourgou, had she merely responded to Ms. Husain's pleas in an appropriate manner, could have achieved a seat transfer with far less effort than Dr. Hanson acting alone.

When a passenger enters a commercial flight, he surrenders a certain level of freedom—freedom of movement, of expression and of choice—in return for a promise of safety and comfort. Passengers agree to abide by a set of rules; they are expected to behave in a certain way in order to avoid communal danger. As an element of this unwritten compact, passengers bestow upon the airline and the flight crew nearly absolute authority to control and manipulate the mobile environment for the benefit of all those aboard. Courts have recognized this authority in both civil and criminal contexts. *See, e.g.,* 49 U.S.C. § 44902; 14 C.F.R. § 91.11. Passengers grant a certain level of power to the airlines, but with that power comes responsibility. The flight crew has the unique ability to provide comfort and safety during air travel, which passengers have the right to expect. *See McDowell,* 54 F.Supp.2d at 1319 ("It is recognized in most jurisdictions that airlines owe a heightened duty of care to their passengers."); *Williams v. Trans World Airlines,* 509 F.2d 942, 946 n. 8 (2d Cir.1975) ("It has generally been held . . . that commercial air lines . . . owe their passengers the duty of utmost care for their safety.").

In this case, as a result of his position as an airline passenger, Dr. Hanson's ability to make decisions about his fate and to act on those decisions was diminished. By entering the controlled environment of the airplane, Dr. Hanson had authorized the flight crew to act on his behalf to protect his safety. In return, he implicitly agreed to obey the commands of the flight crew—to remain in his assigned seat until permitted to move, to sit when told to do so, and not to disrupt the cabin environment. Therefore, while Dr. Hanson himself may have been in the best position to recognize the danger that row 48 presented to him,

he was in the worst position to actually do something about it.

For these reasons, the Court cannot find that Dr. Hanson's negligence played a more significant causal role in his death than did Ms. Leptourgou's wrongdoing. By the same token, because of Dr. Hanson's unique knowledge of the danger, the Court cannot conclude that he played no role in causing his death. In the end, the Court concludes that the failures of both parties contributed equally to the tragedy that followed. Therefore, the Court finds that Dr. Hanson was comparatively liable for his death at a rate of 50%.

## V. Damages

Having determined that defendant is liable under the Warsaw Convention, that defendant's liability is not limited to $75,000, and that defendant was contributorily negligent in causing his own death, the Court must next determine the total amount of damages suffered by plaintiffs as a result of Olympic's misconduct. The evidence before the Court supports an award of damages commensurate with the pecuniary loss to Dr. Hanson's surviving family. The parties have not established in their briefs or their arguments to the Court that damages in excess of that amount are legally appropriate in this case.

To determine the amount of pecuniary damages, the Court received a report and heard testimony from C. Daniel Vencill, Ph.D., who examined Dr. Hanson's financial health for the purposes of determining damages in this case. Dr. Vencill's testimony was uncontradicted, and his conclusions went largely unchallenged by defendant. Defendant's post-trial brief and argument do not attack the validity of Dr. Vencill's methodology or his calculations.

Dr. Hanson's earning history shows an average taxable income of $140,052.12 over the six-year period prior to his death. He intended to work until at least age 65 in order to provide for his family and finance his children's college education. Based on Dr. Vencill's uncontroverted testimony, assuming a 5.5% discount rate and a 2% growth rate, and deducting at a rate of 31% for personal consumption, the Court concludes that the total amount of pecuniary loss to plaintiffs as a result of Dr. Hanson's death was $1,400,000.00.[12]

This finding is supported by Dr. Vencill's calculations, as presented in his written and oral testimony to the Court. In reaching this conclusion, the Court is guided by Dr. Vencill's testimony that the most accurate calculation of Dr. Hanson's income is reached by modifying Dr. Hanson's taxable income to account for cash flow. Additionally, the Court finds Dr. Vencill's calculations based on Dr. Hanson's six-year earnings more reliable than the calculations based on Dr. Hanson's 1997 earnings alone. Finally, although Dr. Vencill posited at trial that a higher figure of approximately $1.5 to $1.6 million was appropriate, the Court accepts the $1.4 million figure because it more accurately reflects the total amount of non-market work performed by Dr. Hanson in his home prior to his death.

As noted above, the Court finds that Dr. Hanson was comparatively negligent at a rate of 50% in causing his death. Therefore, plaintiffs may recover only 50% of their $1,400,000.00 in economic losses. The Court awards plaintiffs $700,000.00 in total damages.

## CONCLUSION

For the foregoing reasons, the Court hereby finds that an accident occurred aboard Olympic Airways Flight 417 on January 4, 1998, and that the accident caused the death of Dr. Abid Hanson. The Court further finds that Olympic Air-

12. Although Dr. Hanson's medical practice sold for $200,000 after his death, the Court will not use this figure to mitigate the total damage to the surviving family members. The practice would have elicited a similar price upon Dr. Hanson's retirement even if he had not died in 1998.

ways committed willful misconduct in failing to react to Ms. Rubina Husain's requests for a seat transfer for her husband. Finally, the Court finds that Dr. Hanson himself was contributorily negligent in causing his death, and that his negligence contributed to his death at a rate of 50%. Accordingly, the Court hereby awards plaintiffs $700,000.00 in damages.

**IT IS SO ORDERED.**